FEDERAL ELECTION COMMISSION *v.* AKINS ET AL.

No. 96–1590. Argued January 14, 1998—Decided June 1, 1998

12

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed a dissenting opinion, in which O'CONNOR and THOMAS, JJ., joined, *post*, p. 29.

*Solicitor General Waxman* argued the cause for the United States. With him on the briefs were *Acting Solicitor General Dellinger, Malcolm L. Stewart, Lawrence M. Noble, Richard B. Bader,* and *David Kolker.*

*Daniel M. Schember* argued the cause for respondents. With him on the brief was *Abdeen Jabara.**

JUSTICE BREYER delivered the opinion of the Court.

The Federal Election Commission (FEC) has determined that the American Israel Public Affairs Committee (AIPAC) is not a "political committee" as defined by the Federal Election Campaign Act of 1971 (FECA or Act), 86 Stat. 11, as amended, 2 U. S. C. §431(4), and, for that reason, the FEC has refused to require AIPAC to make disclosures regarding its membership, contributions, and expenditures that FECA would otherwise require. We hold that respondents, a group of voters, have standing to challenge the

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Joel M. Gora, Steven R. Shapiro,* and *Arthur N. Eisenberg;* and for the National Right to Life Committee, Inc., by *James Bopp, Jr.*

*A. Stephen Hut, Jr., Roger M. Witten, Jeffrey P. Singdahlsen,* and *Donald J. Simon* filed a brief for Common Cause as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the American Israel Public Affairs Committee by *Theodore B. Olson, Mel Levine, Thomas G. Hungar,* and *Philip Friedman;* and for the Brennan Center for Justice by *Burt Neuborne.*

14

Commission's determination in court, and we remand this case for further proceedings.

I

In light of our disposition of this case, we believe it necessary to describe its procedural background in some detail. As commonly understood, the FECA seeks to remedy any actual or perceived corruption of the political process in several important ways. The Act imposes limits upon the amounts that individuals, corporations, "political committees" (including political action committees), and political parties can contribute to a candidate for federal political office. §§ 441a(a), 441a(b), 441b. The Act also imposes limits on the amount these individuals or entities can spend in coordination with a candidate. (It treats these expenditures as "contributions to" a candidate for purposes of the Act.) § 441a(a)(7)(B)(i). As originally written, the Act set limits upon the total amount that a candidate could spend of his own money, and upon the amounts that other individuals, corporations, and "political committees" could spend independent of a candidate—though the Court found that certain of these last-mentioned limitations violated the First Amendment. *Buckley* v. *Valeo,* 424 U. S. 1, 39–59 (1976) *(per curiam); Federal Election Comm'n* v. *National Conservative Political Action Comm.,* 470 U. S. 480, 497 (1985); cf. *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n,* 518 U. S. 604, 613–619 (1996) (opinion of BREYER, J.).

This case concerns requirements in the Act that extend beyond these better-known contribution and expenditure limitations. In particular, the Act imposes extensive recordkeeping and disclosure requirements upon groups that fall within the Act's definition of a "political committee." Those groups must register with the FEC, appoint a treasurer, keep names and addresses of contributors, track the amount and purpose of disbursements, and file complex FEC

reports that include lists of donors giving in excess of $200 per year (often, these donors may be the group's members), contributions, expenditures, and any other disbursements irrespective of their purposes. §§ 432–434.

The Act's use of the word "political committee" calls to mind the term "political action committee," or "PAC," a term that normally refers to organizations that corporations or trade unions might establish for the purpose of making contributions or expenditures that the Act would otherwise prohibit. See §§ 431(4)(B), 441b. But, in fact, the Act's term "political committee" has a much broader scope. The Act states that a "political committee" includes "*any* committee, club, association or other group of persons which receives" more than $1,000 in "contributions" or "which makes" more than $1,000 in "expenditures" in any given year. § 431(4)(A) (emphasis added).

This broad definition, however, is less universally encompassing than at first it may seem, for later definitional subsections limit its scope. The Act defines the key terms "contribution" and "expenditure" as covering only those contributions and expenditures that are made "for the purpose of influencing any election for Federal office." §§ 431(8)(A)(i), (9)(A)(i). Moreover, the Act sets forth detailed categories of disbursements, loans, and assistance-in-kind that do not count as a "contribution" or an "expenditure," even when made for election-related purposes. §§ 431(8)(B), (9)(B). In particular, assistance given to help a candidate will not count toward the $1,000 "expenditure" ceiling that qualifies an organization as a "political committee" if it takes the form of a "communication" by an organization "to its members"—as long as the organization at issue is a "membership organization or corporation" and it is not "organized primarily for the purpose of influencing the nomination . . . or electio[n] of any individual." § 431(9)(B)(iii).

This case arises out of an effort by respondents, a group of voters with views often opposed to those of AIPAC, to

persuade the FEC to treat AIPAC as a "political committee." Respondents filed a complaint with the FEC, stating that AIPAC had made more than $1,000 in qualifying "expenditures" per year, and thereby became a "political committee." 1 Record, Exh. B, p. 4. They added that AIPAC had violated the FEC provisions requiring "political committee[s]" to register and to make public the information about members, contributions, and expenditures to which we have just referred. *Id.*, at 2, 9–17. Respondents also claimed that AIPAC had violated § 441b of FECA, which prohibits corporate campaign "contribution[s]" and "expenditure[s]." *Id.*, at 2, 16–17. They asked the FEC to find that AIPAC had violated the Act, and, among other things, to order AIPAC to make public the information that FECA demands of a "political committee." *Id.*, at 33–34.

AIPAC asked the FEC to dismiss the complaint. AIPAC described itself as an issue-oriented organization that seeks to maintain friendship and promote goodwill between the United States and Israel. App. 120; see also Brief for AIPAC as *Amicus Curiae* (AIPAC Brief) 1, 3. AIPAC conceded that it lobbies elected officials and disseminates information about candidates for public office. App. 43, 120; see also AIPAC Brief 6. But in responding to the § 441b charge, AIPAC denied that it had made the kinds of "expenditures" that matter for FECA purposes (*i. e.*, the kinds of election-related expenditures that corporations cannot make, and which count as the kind of expenditures that, when they exceed $1,000, qualify a group as a "political committee").

To put the matter more specifically: AIPAC focused on certain "expenditures" that respondents had claimed were election related, such as the costs of meetings with candidates, the introduction of AIPAC members to candidates, and the distribution of candidate position papers. AIPAC said that its spending on such activities, even if election related, fell within a relevant exception. They amounted, said AIPAC,

to communications by a membership organization with its members, App. 164–166, which the Act exempts from its definition of "expenditures," § 431(9)(B)(iii). In AIPAC's view, these communications therefore did not violate § 441b's corporate expenditure prohibition. 2 Record, Doc. No. 19, pp. 2–6. (And, if AIPAC was right, those expenditures would not count toward the $1,000 ceiling on "expenditures" that might transform an ordinary issue-related group into a "political committee." § 431(4).)

The FEC's General Counsel concluded that, between 1983 and 1988, AIPAC had indeed funded communications of the sort described. The General Counsel said that those expenditures were campaign related, in that they amounted to advocating the election or defeat of particular candidates. App. 106–108. He added that these expenditures were "likely to have crossed the $1,000 threshold." *Id.*, at 146. At the same time, the FEC closed the door to AIPAC's invocation of the "communications" exception. The FEC said that, although it was a "close question," these expenditures were not membership communications, because that exception applies to a membership organization's communications with its members, and most of the persons who belonged to AIPAC did not qualify as "members" for purposes of the Act. App. to Pet. for Cert. 97a–98a; see also App. 170–173. Still, given the closeness of the issue, the FEC exercised its discretion and decided not to proceed further with respect to the claimed "corporate contribution" violation. App. to Pet. for Cert. 98a.

The FEC's determination that many of the persons who belonged to AIPAC were not "members" effectively foreclosed any claim that AIPAC's communications did not count as "expenditures" for purposes of determining whether it was a "political committee." Since AIPAC's activities fell outside the "membership communications" exception, AIPAC could not invoke that exception as a way of escaping

the scope of the Act's term "political committee" and the Act's disclosure provisions, which that definition triggers.

The FEC nonetheless held that AIPAC was not subject to the disclosure requirements, but for a different reason. In the FEC's view, the Act's definition of "political committee" includes only those organizations that have as a "major purpose" the nomination or election of candidates. Cf. *Buckley* v. *Valeo*, 424 U. S., at 79. AIPAC, it added, was fundamentally an issue-oriented lobbying organization, not a campaign-related organization, and hence AIPAC fell outside the definition of a "political committee" regardless. App. 146. The FEC consequently dismissed respondents' complaint.

Respondents filed a petition in Federal District Court seeking review of the FEC's determination dismissing their complaint. See §§ 437g(a)(8)(A), 437g(a)(8)(C). The District Court granted summary judgment for the FEC, and a divided panel of the Court of Appeals affirmed. 66 F. 3d 348 (CADC 1995). The en banc Court of Appeals reversed, however, on the ground that the FEC's "major purpose" test improperly interpreted the Act's definition of a "political committee." 101 F. 3d 731 (CADC 1997). We granted the FEC's petition for certiorari, which contained the following two questions:

> "1. Whether respondents had standing to challenge the Federal Election Commission's decision not to bring an enforcement action in this case.
>
> "2. Whether an organization that spends more than $1,000 on contributions or coordinated expenditures in a calendar year, but is neither controlled by a candidate nor has its major purpose the nomination or election of candidates, is a 'political committee' within the meaning of the [Act]." Brief for Petitioner I.

We shall answer the first of these questions, but not the second.

## II

The Solicitor General argues that respondents lack standing to challenge the FEC's decision not to proceed against AIPAC. He claims that they have failed to satisfy the "prudential" standing requirements upon which this Court has insisted. See, *e. g., National Credit Union Admin.* v. *First Nat. Bank & Trust Co.*, 522 U. S. 479, 488 (1998) *(NCUA); Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150, 153 (1970) *(Data Processing)*. He adds that respondents have not shown that they "suffe[r] injury in fact," that their injury is "fairly traceable" to the FEC's decision, or that a judicial decision in their favor would "redres[s]" the injury. *E. g., Bennett* v. *Spear*, 520 U. S. 154, 162 (1997) (internal quotation marks omitted); *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992). In his view, respondents' District Court petition consequently failed to meet Article III's demand for a "case" or "controversy."

We do not agree with the FEC's "prudential standing" claim. Congress has specifically provided in FECA that "[a]ny person who believes a violation of this Act . . . has occurred, may file a complaint with the Commission." § 437g(a)(1). It has added that "[a]ny party aggrieved by an order of the Commission dismissing a complaint filed by such party . . . may file a petition" in district court seeking review of that dismissal. § 437g(a)(8)(A). History associates the word "aggrieved" with a congressional intent to cast the standing net broadly—beyond the common-law interests and substantive statutory rights upon which "prudential" standing traditionally rested. *Scripps-Howard Radio, Inc.* v. *FCC*, 316 U. S. 4 (1942); *FCC* v. *Sanders Brothers Radio Station*, 309 U. S. 470 (1940); *Office of Communication of the United Church of Christ* v. *FCC*, 359 F. 2d 994 (CADC 1966) (Burger, J.); *Associated Industries of New York State* v. *Ickes*, 134 F. 2d 694 (CA2 1943) (Frank, J.). Cf. Administrative Procedure Act, 5 U. S. C. § 702 (stating that those "suf-

fering legal wrong" or "adversely affected or aggrieved . . . within the meaning of a relevant statute" may seek judicial review of agency action).

Moreover, prudential standing is satisfied when the injury asserted by a plaintiff "'arguably [falls] within the zone of interests to be protected or regulated by the statute . . . in question.'" *NCUA, supra,* at 488 (quoting *Data Processing, supra,* at 153). The injury of which respondents complain— their failure to obtain relevant information—is injury of a kind that FECA seeks to address. *Buckley, supra,* at 66– 67 ("political committees" must disclose contributors and disbursements to help voters understand who provides which candidates with financial support). We have found nothing in the Act that suggests Congress intended to exclude voters from the benefits of these provisions, or otherwise to restrict standing, say, to political parties, candidates, or their committees.

Given the language of the statute and the nature of the injury, we conclude that Congress, intending to protect voters such as respondents from suffering the kind of injury here at issue, intended to authorize this kind of suit. Consequently, respondents satisfy "prudential" standing requirements. Cf. *Raines* v. *Byrd,* 521 U. S. 811, 820, n. 3 (1997) (explicit grant of authority to bring suit "eliminates any prudential standing limitations and significantly lessens the risk of unwanted conflict with the Legislative Branch").

Nor do we agree with the FEC or the dissent that Congress lacks the constitutional power to authorize federal courts to adjudicate this lawsuit. Article III, of course, limits Congress' grant of judicial power to "cases" or "controversies." That limitation means that respondents must show, among other things, an "injury in fact"—a requirement that helps assure that courts will not "pass upon . . . abstract, intellectual problems," but adjudicate "concrete, living contest[s] between adversaries." *Coleman* v. *Miller,* 307 U. S. 433, 460 (1939) (Frankfurter, J., dissenting); see also *Bennett,*

*supra*, at 167; *Lujan, supra*, at 560–561. In our view, respondents here have suffered a genuine "injury in fact."

The "injury in fact" that respondents have suffered consists of their inability to obtain information—lists of AIPAC donors (who are, according to AIPAC, its members), and campaign-related contributions and expenditures—that, on respondents' view of the law, the statute requires that AIPAC make public. There is no reason to doubt their claim that the information would help them (and others to whom they would communicate it) to evaluate candidates for public office, especially candidates who received assistance from AIPAC, and to evaluate the role that AIPAC's financial assistance might play in a specific election. Respondents' injury consequently seems concrete and particular. Indeed, this Court has previously held that a plaintiff suffers an "injury in fact" when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute. *Public Citizen* v. *Department of Justice*, 491 U. S. 440, 449 (1989) (failure to obtain information subject to disclosure under Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue"). See also *Havens Realty Corp.* v. *Coleman*, 455 U. S. 363, 373–374 (1982) (deprivation of information about housing availability constitutes "specific injury" permitting standing).

The dissent refers to *United States* v. *Richardson*, 418 U. S. 166 (1974), a case in which a plaintiff sought information (details of Central Intelligence Agency (CIA) expenditures) to which, he said, the Constitution's Accounts Clause, Art. I, §9, cl. 7, entitled him. The Court held that the plaintiff there lacked Article III standing. 418 U. S., at 179–180. The dissent says that *Richardson* and this case are "indistinguishable." *Post*, at 34. But as the parties' briefs suggest—for they do not mention *Richardson*—that case does not control the outcome here.

*Richardson*'s plaintiff claimed that a statute permitting the CIA to keep its expenditures nonpublic violated the Ac-

counts Clause, which requires that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." 418 U. S., at 167–169. The Court held that the plaintiff lacked standing because there was "no 'logical nexus' between the [plaintiff's] asserted status of taxpayer and the claimed failure of the Congress to require the Executive to supply a more detailed report of the [CIA's] expenditures." *Id.*, at 175; see also *id.*, at 174 (quoting *Flast* v. *Cohen*, 392 U. S. 83, 102 (1968), for the proposition that in "taxpayer standing" cases, there must be "'a logical nexus between the status asserted and the claim sought to be adjudicated'").

In this case, however, the "logical nexus" inquiry is not relevant. Here, there is no constitutional provision requiring the demonstration of the "nexus" the Court believed must be shown in *Richardson* and *Flast*. Rather, there is a statute which, as we previously pointed out, *supra*, at 19–20, does seek to protect individuals such as respondents from the kind of harm they say they have suffered, *i. e.*, failing to receive particular information about campaign-related activities. Cf. *Richardson*, 418 U. S., at 178, n. 11.

The fact that the Court in *Richardson* focused upon taxpayer standing, *id.*, at 171–178, not voter standing, places that case at still a greater distance from the case before us. We are not suggesting, as the dissent implies, *post*, at 32–34, that *Richardson* would have come out differently if only the plaintiff had asserted his standing to sue as a voter, rather than as a taxpayer. Faced with such an assertion, the *Richardson* Court would simply have had to consider whether "the Framers . . . ever imagined that *general directives* [of the Constitution] . . . would be subject to enforcement by an individual citizen." 418 U. S., at 178, n. 11 (emphasis added). But since that answer (like the answer to whether there was taxpayer standing in *Richardson*) would have rested in significant part upon the Court's view of the Accounts Clause, it still would not control our answer in this case. All this is

to say that the legal logic which critically determined *Richardson's* outcome is beside the point here.

The FEC's strongest argument is its contention that this lawsuit involves only a "generalized grievance." (Indeed, if *Richardson* is relevant at all, it is because of its broad discussion of *this* matter, see *id.,* at 176–178, not its basic rationale.) The FEC points out that respondents' asserted harm (their failure to obtain information) is one which is " 'shared in substantially equal measure by all or a large class of citizens.' " Brief for Petitioner 28 (quoting *Warth* v. *Seldin,* 422 U. S. 490, 499 (1975)). This Court, the FEC adds, has often said that "generalized grievance[s]" are not the kinds of harms that confer standing. Brief for Petitioner 28; see also *Lujan,* 504 U. S., at 573–574; *Allen* v. *Wright,* 468 U. S. 737, 755–756 (1984); *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 475–479 (1982); *Richardson, supra,* at 176–178; *Frothingham* v. *Mellon,* decided with *Massachusetts* v. *Mellon,* 262 U. S. 447, 487 (1923); *Ex parte Levitt,* 302 U. S. 633, 634 (1937) *(per curiam).* Whether styled as a constitutional or prudential limit on standing, the Court has sometimes determined that where large numbers of Americans suffer alike, the political process, rather than the judicial process, may provide the more appropriate remedy for a widely shared grievance. *Warth, supra,* at 500; *Schlesinger* v. *Reservists Comm. to Stop the War,* 418 U. S. 208, 222 (1974); *Richardson,* 418 U. S., at 179; *id.,* at 188–189 (Powell, J., concurring); see also *Flast, supra,* at 131 (Harlan, J., dissenting).

The kind of judicial language to which the FEC points, however, invariably appears in cases where the harm at issue is not only widely shared, but is also of an abstract and indefinite nature—for example, harm to the "common concern for obedience to law." *L. Singer & Sons* v. *Union Pacific R. Co.,* 311 U. S. 295, 303 (1940); see also *Allen, supra,* at 754; *Schlesinger, supra,* at 217. Cf. *Lujan, supra,* at 572–578 (injury to interest in seeing that certain procedures are fol-

lowed not normally sufficient by itself to confer standing); *Frothingham, supra,* at 488 (party may not merely assert that "he suffers in some indefinite way in common with people generally"); *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, 125 (1940) (plaintiffs lack standing because they have failed to show injury to "a particular right of their own, as distinguished from the public's interest in the administration of the law"). The abstract nature of the harm—for example, injury to the interest in seeing that the law is obeyed—deprives the case of the concrete specificity that characterized those controversies which were "the traditional concern of the courts at Westminster," *Coleman,* 307 U. S., at 460 (Frankfurter, J., dissenting); and which today prevents a plaintiff from obtaining what would, in effect, amount to an advisory opinion. Cf. *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 240–241 (1937).

Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found "injury in fact." See *Public Citizen,* 491 U. S., at 449–450 ("The fact that other citizens or groups of citizens might make the same complaint after unsuccessfully demanding disclosure . . . does not lessen [their] asserted injury"). Thus the fact that a political forum may be more readily available where an injury is widely shared (while counseling against, say, interpreting a statute as conferring standing) does not, by itself, automatically disqualify an interest for Article III purposes. Such an interest, where sufficiently concrete, may count as an "injury in fact." This conclusion seems particularly obvious where (to use a hypothetical example) large numbers of individuals suffer the same common-law injury (say, a widespread mass tort), or where large numbers of voters suffer interference with voting rights conferred by law. Cf. *Lujan, supra,* at 572; *Shaw* v. *Hunt,* 517 U. S. 899, 905 (1996). We conclude that, similarly, the informational injury at issue here, di-

rectly related to voting, the most basic of political rights, is sufficiently concrete and specific such that the fact that it is widely shared does not deprive Congress of constitutional power to authorize its vindication in the federal courts.

Respondents have also satisfied the remaining two constitutional standing requirements. The harm asserted is "fairly traceable" to the FEC's decision about which respondents complain. Of course, as the FEC points out, Brief for Petitioner 29–31, it is possible that even had the FEC agreed with respondents' view of the law, it would still have decided in the exercise of its discretion not to require AIPAC to produce the information. Cf. App. to Pet. for Cert. 98a (deciding to exercise prosecutorial discretion, see *Heckler* v. *Chaney*, 470 U. S. 821 (1985), and "take no further action" on § 441b allegation against AIPAC). But that fact does not destroy Article III "causation," for we cannot know that the FEC would have exercised its prosecutorial discretion in this way. Agencies often have discretion about whether or not to take a particular action. Yet those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground. See, *e. g., Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140 (1967) (discussing presumption of reviewability of agency action); *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 410 (1971). If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason. *SEC* v. *Chenery Corp.*, 318 U. S. 80 (1943). Thus respondents' "injury in fact" is "fairly traceable" to the FEC's decision not to issue its complaint, even though the FEC might reach the same result exercising its discretionary powers lawfully. For similar reasons, the courts in this case can "redress" respondents' "injury in fact."

Finally, the FEC argues that we should deny respondents standing because this case involves an agency's decision not to undertake an enforcement action—an area generally not subject to judicial review. Brief for Petitioner 23, 29. In *Heckler*, this Court noted that agency enforcement decisions "ha[ve] traditionally been 'committed to agency discretion,'" and concluded that Congress did not intend to alter that tradition in enacting the APA. 470 U. S., at 832; cf. 5 U. S. C. § 701(a) (courts will not review agency actions where "statutes preclude judicial review," or where the "agency action is committed to agency discretion by law"). We deal here with a statute that explicitly indicates the contrary.

In sum, respondents, as voters, have satisfied both prudential and constitutional standing requirements. They may bring this petition for a declaration that the FEC's dismissal of their complaint was unlawful. See 2 U. S. C. § 437g(a)(8)(A).

### III

The second question presented in the FEC's petition for certiorari is whether an organization that otherwise satisfies the Act's definition of a "political committee," and thus is subject to its disclosure requirements, nonetheless falls outside that definition because "its major purpose" is not "the nomination or election of candidates." The question arises because this Court, in *Buckley*, said:

> "To fulfill the purposes of the Act [the term 'political committee'] need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." 424 U. S., at 79.

The Court reiterated in *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238, 252, n. 6 (1986):

> "[A]n entity subject to regulation as a 'political committee' under the Act is one that is either 'under the control

of a candidate or the major purpose of which is the nomination or election of a candidate.'"

The FEC here interpreted this language as narrowing the scope of the statutory term "political committee," wherever applied. And, as we have said, the FEC's General Counsel found that AIPAC fell outside that definition because the nomination or election of a candidate was not AIPAC's "major purpose." App. 146.

The en banc Court of Appeals disagreed with the FEC. It read this Court's narrowing construction of the term "political committee" as turning on the First Amendment problems presented by regulation of "independent expenditures" (*i. e.*, "an expenditure by a person expressly advocating the election or defeat of a clearly identified candidate which is made without cooperation or consultation with any candidate," § 431(17)). 101 F. 3d, at 741. The Court of Appeals concluded that the language in this Court's prior decisions narrowing the definition of "political committee" did not apply where the special First Amendment "independent expenditure" problem did not exist. *Id.*, at 742–743.

The Solicitor General argues that this Court's narrowing definition of "political committee" applies not simply in the context of independent expenditures, but across the board. We cannot squarely address that matter, however, because of the unusual and complex circumstances in which this case arises. As we previously mentioned, *supra*, at 16–17, the FEC considered a related question, namely, whether AIPAC was exempt from § 441b's prohibition of corporate campaign expenditures, on the grounds that the so-called "expenditures" involved only AIPAC's communications with its members. The FEC held that the statute's exception to the "expenditure" definition for communications by a "membership organization" did not apply because many of the persons who belonged to AIPAC were not "members" as defined by FEC regulation. The FEC acknowledged, however, that this was a "close question." App. to Pet. for Cert. 98a; see also App.

144–146, 170–171. In particular, the FEC thought that many of the persons who belonged to AIPAC lacked sufficient control of the organization's policies to qualify as "members" for purposes of the Act.

A few months later, however, the Court of Appeals overturned the FEC's regulations defining "members," in part because that court thought the regulations defined membership organizations too narrowly in light of an organization's "First Amendment right to communicate with its 'members.'" *Chamber of Commerce* v. *Federal Election Comm'n*, 69 F. 3d 600, 605 (CADC 1995). The FEC has subsequently issued proposed rules redefining "members." Under these rules, it is quite possible that many of the persons who belong to AIPAC would be considered "members." If so, the communications here at issue apparently would not count as the kind of "expenditures" that can turn an organization into a "political committee," and AIPAC would fall outside the definition for that reason, rather than because of the "major purpose" test. 62 Fed. Reg. 66832 (1997) (proposed 11 CFR pts. 100 and 114).

The consequence for our consideration of Question Two now is that the FEC's new rules defining "membership organization" could significantly affect the interpretive issue presented by this question. If the Court of Appeals is right in saying that this Court's narrowing interpretation of "political committee" in *Buckley* reflected First Amendment concerns, 101 F. 3d, at 741, then whether the "membership communications" exception is interpreted broadly or narrowly could affect our evaluation of the Court of Appeals' claim that there is no constitutionally driven need to apply *Buckley*'s narrowing interpretation in this context. The scope of the "membership communications" exception could also affect our evaluation of the Solicitor General's related argument that First Amendment concerns (reflected in *Buckley*'s narrowing interpretation) are present whenever the Act requires disclosure. In any event, it is difficult to decide the

basic issue that Question Two presents without considering the special communicative nature of the "expenditures" here at issue, cf. *United States* v. *CIO*, 335 U. S. 106, 121 (1948) (describing relation between membership communications and constitutionally protected rights of association). And, a considered determination of the scope of the statutory exemption that Congress enacted to address membership communications would helpfully inform our consideration of the "major purpose" test.

The upshot, in our view, is that we should permit the FEC to address, in the first instance, the issue presented by Question Two. We can thereby take advantage of the relevant agency's expertise, by allowing it to develop a more precise rule that may dispose of this case, or at a minimum, will aid the Court in reaching a more informed conclusion. In our view, the FEC should proceed to determine whether or not AIPAC's expenditures qualify as "membership communications," and thereby fall outside the scope of "expenditures" that could qualify it as a "political committee." If the FEC decides that despite its new rules, the communications here do not qualify for this exception, then the lower courts, in reconsidering respondents' arguments, can still evaluate the significance of the communicative context in which the case arises. If, on the other hand, the FEC decides that AIPAC's activities fall within the "membership communications" exception, the matter will become moot.

For these reasons, the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE O'CONNOR and JUSTICE THOMAS join, dissenting.

The provision of law at issue in this case is an extraordinary one, conferring upon a private person the ability to bring an Executive agency into court to compel its enforce-

ment of the law against a third party. Despite its liberality, the Administrative Procedure Act does not allow such suits, since enforcement action is traditionally deemed "committed to agency discretion by law." 5 U. S. C. § 701(a)(2); *Heckler* v. *Chaney*, 470 U. S. 821, 827–835 (1985). If provisions such as the present one were commonplace, the role of the Executive Branch in our system of separated and equilibrated powers would be greatly reduced, and that of the Judiciary greatly expanded.

Because this provision is so extraordinary, we should be particularly careful not to expand it beyond its fair meaning. In my view the Court's opinion does that. Indeed, it expands the meaning beyond what the Constitution permits.

I

It is clear that the Federal Election Campaign Act of 1971 (FECA or Act) does not intend that *all* persons filing complaints with the Federal Election Commission have the right to seek judicial review of the rejection of their complaints. This is evident from the fact that the Act permits a complaint to be filed by "[a]ny *person* who believes a violation of this Act . . . has occurred," 2 U. S. C. § 437g(a)(1) (emphasis added), but accords a right to judicial relief only to "[a]ny *party aggrieved by* an order of the Commission dismissing a complaint filed by such party," § 437g(a)(8)(A) (emphasis added). The interpretation that the Court gives the latter provision deprives it of almost all its limiting force. *Any voter* can sue to compel the agency to require registration of an entity as a political committee, even though the "aggrievement" consists of nothing more than the deprivation of access to information whose public availability would have been one of the consequences of registration.

This seems to me too much of a stretch. It should be borne in mind that the agency action complained of here is not the refusal to make available information in its possession that the Act requires to be disclosed. A person de-

manding provision of information that the law requires the agency to furnish—one demanding compliance with the Freedom of Information Act or the Federal Advisory Committee Act, for example—can reasonably be described as being "aggrieved" by the agency's refusal to provide it. What the respondents complain of in this suit, however, is not the refusal to provide information, but the refusal (for an allegedly improper reason) to commence an agency enforcement action against a third person. That refusal *itself* plainly does not render respondents "aggrieved" within the meaning of the Act, for in that case there would have been no reason for the Act to differentiate between "person" in subsection (a)(1) and "party aggrieved" in subsection (a)(8). Respondents claim that each of them is elevated to the special status of a "party aggrieved" by the fact that the requested enforcement action (if it was successful) would have had the effect, among others, of placing certain information in the agency's possession, where respondents, along with everyone else in the world, would have had access to it. It seems to me most unlikely that the failure to produce that effect—*both* a secondary consequence of what respondents immediately seek, *and* a consequence that affects respondents no more and with no greater particularity than it affects virtually the entire population—would have been meant to set apart each respondent as a "party aggrieved" (as opposed to just a rejected complainant) within the meaning of the statute.

This conclusion is strengthened by the fact that this citizen-suit provision was enacted two years after this Court's decision in *United States* v. *Richardson*, 418 U. S. 166 (1974), which, as I shall discuss at greater length below, gave Congress every reason to believe that a voter's interest in information helpful to his exercise of the franchise was *constitutionally inadequate* to confer standing. *Richardson* had said that a plaintiff's complaint that the Government was unlawfully depriving him of information he needed to

"properly fulfill his obligations as a member of the electorate in voting" was "surely the kind of a generalized grievance" that does not state an Article III case or controversy. *Id.*, at 176.

And finally, a narrower reading of "party aggrieved" is supported by the doctrine of constitutional doubt, which counsels us to interpret statutes, if possible, in such fashion as to avoid grave constitutional questions. See *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U. S. 366, 408 (1909); *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988). As I proceed to discuss, it is my view that the Court's entertainment of the present suit violates Article III. Even if one disagrees with that judgment, however, it is clear from *Richardson* that the question is a close one, so that the statute ought not be interpreted to present it.

II

In *Richardson*, we dismissed for lack of standing a suit whose "aggrievement" was precisely the "aggrievement" respondents assert here: the Government's unlawful refusal to place information within the public domain. The only difference, in fact, is that the aggrievement there was more direct, since the Government already had the information within its possession, whereas here respondents seek enforcement action that will bring information within the Government's possession and *then* require the information to be made public. The plaintiff in *Richardson* challenged the Government's failure to disclose the expenditures of the Central Intelligence Agency (CIA), in alleged violation of the constitutional requirement, Art. I, § 9, cl. 7, that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." We held that such a claim was a nonjusticiable "generalized grievance" because "the impact on [plaintiff] is plainly undif-

ferentiated and common to all members of the public." 418 U. S., at 176–177 (internal quotation marks and citations omitted).

It was alleged in *Richardson* that the Government had denied a right conferred by the Constitution, whereas respondents here assert a right conferred by statute—but of course "there is absolutely no basis for making the Article III inquiry turn on the source of the asserted right." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 576 (1992). The Court today distinguishes *Richardson* on a different basis— a basis that reduces it from a landmark constitutional holding to a curio. According to the Court, "*Richardson* focused upon taxpayer standing, . . . not voter standing." *Ante*, at 22. In addition to being a silly distinction, given the weighty governmental purpose underlying the "generalized grievance" prohibition—viz., to avoid "something in the nature of an Athenian democracy or a New England town meeting to oversee the conduct of the National Government by means of lawsuits in federal courts," 418 U. S., at 179— this is also a distinction that the Court in *Richardson* went out of its way explicitly to eliminate. It is true enough that the narrow question presented in *Richardson* was "'[w]hether a federal taxpayer has standing,'" *id.*, at 167, n. 1. But the *Richardson* Court did not hold only, as the Court today suggests, that the plaintiff failed to qualify for the exception to the rule of no taxpayer standing established by the "logical nexus" test of *Flast* v. *Cohen*, 392 U. S. 83 (1968).* The plaintiff's complaint in *Richardson* had also alleged that he was "'a member of the electorate,'" 418 U. S., at 167, n. 1, and he asserted injury in that capacity as well.

---

*That holding was inescapable since, as the Court made clear in another case handed down the same day, "the *Flast* nexus test is not applicable where the taxing and spending power is not challenged" (as in *Richardson* it was not). *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208, 225, n. 15 (1974).

The *Richardson* opinion treated that as fairly included within the taxpayer-standing question, or at least as plainly indistinguishable from it:

> "The respondent's claim is that without detailed information on CIA expenditures—and hence its activities—he cannot intelligently follow the actions of Congress or the Executive, *nor can he properly fulfill his obligations as a member of the electorate in voting for candidates seeking national office.*
>
> "*This is surely the kind of a generalized grievance described in both Frothingham* and *Flast* since the impact on him is plainly undifferentiated and common to all members of the public." *Id.*, at 176–177 (citations and internal quotation marks omitted) (emphasis added).

If *Richardson* left voter standing unaffected, one must marvel at the unaccustomed ineptitude of the American Civil Liberties Union Foundation, which litigated *Richardson,* in not immediately refiling with an explicit voter-standing allegation. Fairly read, and applying a fair understanding of its important purposes, *Richardson* is indistinguishable from the present case.

The Court's opinion asserts that our language disapproving generalized grievances "invariably appears in cases where the harm at issue is not only widely shared, but is also of an abstract and indefinite nature." *Ante,* at 23. "Often," the Court says, "the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found 'injury in fact.'" *Ante,* at 24. If that is so—if concrete generalized grievances (like concrete particularized grievances) are OK, and abstract generalized grievances (like abstract particularized grievances) are bad—one must wonder why we ever *developed* the superfluous distinction between generalized and particularized grievances at all. But of course the Court is

wrong to think that generalized grievances have only concerned us when they are abstract. One need go no further than *Richardson* to prove that—unless the Court believes that deprivation of information is an abstract injury, in which event this case could be disposed of on that much broader ground.

What is noticeably lacking in the Court's discussion of our generalized-grievance jurisprudence is all reference to two words that have figured in it prominently: "particularized" and "undifferentiated." See *Richardson, supra,* at 177; *Lujan,* 504 U. S., at 560, and n. 1. "Particularized" means that "the injury must affect the plaintiff in a personal and individual way." *Id.,* at 560, n. 1. If the effect is "undifferentiated and common to all members of the public," *Richardson, supra,* at 177 (internal quotation marks and citations omitted), the plaintiff has a "generalized grievance" that must be pursued by political, rather than judicial, means. These terms explain why it is a gross oversimplification to reduce the concept of a generalized grievance to nothing more than "the fact that [the grievance] is widely shared," *ante,* at 25, thereby enabling the concept to be dismissed as a standing principle by such examples as "large numbers of individuals suffer[ing] the same common-law injury (say, a widespread mass tort), or . . . large numbers of voters suffer[ing] interference with voting rights conferred by law," *ante,* at 24. The exemplified injuries are widely shared, to be sure, but each individual suffers a particularized and differentiated harm. One tort victim suffers a burnt leg, another a burnt arm—or even if both suffer burnt arms they are *different* arms. One voter suffers the deprivation of *his* franchise, another the deprivation of *hers.* With the generalized grievance, on the other hand, the injury or deprivation is not only widely shared but it is *undifferentiated.* The harm caused to Mr. Richardson by the alleged disregard of the Statement-of-Accounts Clause was precisely the same as the harm caused to everyone else: unavailability of a de-

scription of CIA expenditures. Just as the (more indirect) harm caused to Mr. Akins by the allegedly unlawful failure to enforce FECA is precisely the same as the harm caused to everyone else: unavailability of a description of AIPAC's activities.

The Constitution's line of demarcation between the Executive power and the judicial power presupposes a common understanding of the type of interest needed to sustain a "case or controversy" against the Executive in the courts. A system in which the citizenry at large could sue to compel Executive compliance with the law would be a system in which the courts, rather than the President, are given the primary responsibility to "take Care that the Laws be faithfully executed," Art. II, §3. We do not have such a system because the common understanding of the interest necessary to sustain suit has included the requirement, affirmed in *Richardson,* that the complained-of injury be particularized and differentiated, rather than common to all the electorate. When the Executive can be directed by the courts, at the instance of any voter, to remedy a deprivation that affects the entire electorate in precisely the same way—and particularly when that deprivation (here, the unavailability of information) is one inseverable part of a larger enforcement scheme—there has occurred a shift of political responsibility to a branch designed not to protect the public at large but to protect individual rights. "To permit Congress to convert the undifferentiated public interest in executive officers' compliance with the law into an 'individual right' vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty . . . ." *Lujan, supra,* at 577. If today's decision is correct, it is within the power of Congress to authorize any interested person to manage (through the courts) the Executive's enforcement of any law that includes a requirement for the filing and public availability of a piece of paper.

This is not the system we have had, and is not the system we should desire.

* * *

Because this statute should not be interpreted to confer upon the entire electorate the power to invoke judicial direction of prosecutions, and because if it is so interpreted the statute unconstitutionally transfers from the Executive to the courts the responsibility to "take Care that the Laws be faithfully executed," Art. II, §3, I respectfully dissent.