Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 13, 2003        Decided December 16, 2003

No. 02–1273

HYDRO INVESTORS, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ALGONQUIN POWER CORPORATION INC., ET AL.,
INTERVENORS

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*Carolyn Elefant* argued the cause for petitioner. With her on the brief was *Paul V. Nolan.*

*Beth G. Pacella*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on

_____

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

*Elizabeth W. Whittle* and *John N. Estes III* were on the brief for intervenors.

Before: SENTELLE, HENDERSON and GARLAND, *Circuit Judges*.

SENTELLE, *Circuit Judge*: This petition for review concerns eight hydroelectric power projects owned by three corporations – Trafalgar Power Inc., Christine Falls Corporation, and Franklin Industrial Complex, Inc. (collectively, "Trafalgar"), which are owned and controlled by a single individual. Petitioner Hydro Investors, Inc. ("Hydro"), a developer of hydroelectric projects, claims that the Federal Energy Regulatory Commission has failed to regulate these projects in accordance with the Federal Power Act. Hydro, however, has not shown that it has a legally protected interest in the projects and so we dismiss its petition for review for lack of standing.

## I.

Trafalgar holds federal energy licenses and one license exemption to operate eight hydroelectric power projects, seven in New York and one in New Hampshire. FERC issued the licenses under Part I of the Federal Power Act. 16 U.S.C. §§ 791a–823b (2000). This act authorizes FERC to issue licenses and grant exemptions from licensing for the construction, operation, and maintenance of hydroelectric projects on federal lands and on waterways regulated under the Commerce Clause. *Id.* §§ 797(e), 823a.

Trafalgar's projects were miserable financial failures. In 1995 it defaulted on the loans used to finance the projects. The corporations that control the projects are all now insolvent; Chapter 11 bankruptcy proceedings are pending for all three.

Algonquin Power Corporation, its subsidiaries, and related entities (to which, for simplicity, we refer collectively as "Algonquin") currently control what's left of the projects. It took control after Trafalgar's 1995 default. Subsequently, in

1996, Algonquin purchased the rights to payment on Trafalgar's debt at a large discount from the debt's face value. That debt is secured by liens in the project property, including the licenses. Algonquin is not, however, a co-licensee of the projects; the sole licensees continue to be Trafalgar and its affiliated entities. Algonquin has since tried to foreclose on its liens in the project property, but that proceeding was stayed when the Trafalgar entities filed for bankruptcy in 2001.

A distinct corporation, Hydro, petitioned FERC alleging that the arrangement between Algonquin and Trafalgar violated the Federal Power Act. That act forbids energy licensees from "voluntari[ly] transfer[ring]" their licenses without FERC's approval. 16 U.S.C. § 801 (2000). Because Trafalgar never formally transferred the project's licenses to Algonquin, Hydro claimed that Algonquin exercised an illegal amount of control over and effective "ownership" of the projects (and hence the licenses). Hydro also alleged that Algonquin and Trafalgar used irregular accounting practices to mask their draining the projects of assets and urged FERC to investigate these allegations of financial improprieties more fully. FERC rejected all of these claims on their merits. *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 98 FERC ¶ 61,272 (March 12, 2002); *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 99 FERC ¶ 61,384 (June 28, 2002) (rehearing proceeding). Hydro then petitioned this Court for review.

More relevant to our disposition of the present petition than Hydro's claims on the merits, however, is its purported interest in the hydroelectric projects. This interest, according to Hydro, derives from joint venture agreements it had with Trafalgar in seven of the projects. At the inception of six of the projects, Hydro entered into a joint venture with Trafalgar to develop the projects. Apparently, the idea was that Hydro's owner, Neal Dunlevy, was to provide the engineering expertise, and Trafalgar was to provide the capital.

The joint venture agreement provided that Hydro would receive distributions from project profits only if Trafalgar,

among other things, recovered its capital investment in the projects, and only if the projects were constructed within budget and met the expected energy output. In 1999, in breach-of-contract and tort litigation between the parties, a jury found that Trafalgar had not breached its joint venture agreement with Hydro. Trafalgar argued at trial that it had not breached the agreement because the conditions precedent to Hydro's receiving profit distributions had not occurred. In support, Trafalgar presented evidence that Dunlevy's estimates of the expected energy output of the plants, on which Trafalgar had relied in deciding how much to invest in them, were much too high. Even under the best operating conditions, the evidence showed, the plants never could have produced the projected amounts of energy. *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 63 F. Supp. 2d 225, 227 (N.D.N.Y. 1999). The jury found that Dunlevy's conduct was engineering malpractice and awarded Trafalgar a $7.6 million judgment. A panel of the Second Circuit affirmed the jury's verdict. *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8 (2d Cir. 2000).

Hydro also claims it has a joint venture interest in a seventh Trafalgar-affiliated hydroelectric project – the Christine Falls project. Trafalgar and Hydro are currently embroiled in breach-of-contract litigation in New York state court over whether Hydro has such an interest in this project. That suit is still pending.

To protect these purported joint venture interests, Hydro has filed proofs of its claims in the Trafalgar entities' various bankruptcy proceedings. Hydro has also filed an adversarial proceeding in the Trafalgar bankruptcy asserting that the claims of other Trafalgar debtors should be equitably subordinated to its joint venture claim. These bankruptcies, as well as Hydro's adversarial proceeding, are pending.

## II.

The threshold issue in this case is whether Hydro has shown that its interests in these purported joint venture agreements give it Article III standing to bring this petition

for review. Only "aggrieved" parties may seek judicial review of FERC decisions. 16 U.S.C. § 825*l*(b) (2000). A party is aggrieved under this provision only if it establishes it has both Article III and prudential standing to bring the petition. *Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607, 613 (D.C. Cir. 2002). To establish Article III standing, Hydro must show that FERC's action has caused it some concrete injury that the relief it seeks – invalidation of the putatively unlawful license transfer and further exploration of the alleged financial improprieties – will redress. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc).

The only concrete interest to which Hydro points is the joint venture agreements. Hydro's argument is that the transfer of the licenses from Trafalgar to Algonquin has freed Algonquin from FERC's jurisdiction, and thus its regulatory obligations. Without that regulatory deterrent, the argument goes, Algonquin is more likely to continue draining assets from the projects, and thus to diminish the value of its joint venture ownership interest. The argument assumes that these joint venture interests have value. Hydro has not established this key assumption.

To the contrary, Hydro's joint venture interest appears to be worthless. The terms of Hydro's joint venture agreement with Trafalgar entitle Hydro to profit distributions only if Trafalgar recovers its capital investment in the projects and meets the expected energy output. Neither of these conditions has occurred or is remotely likely ever to occur. The evidence presented during the breach-of-contract trial between Trafalgar and Hydro's owner showed that the projects never did meet, nor could have met, the required energy projections. Again, the projects were financial disasters. Trafalgar defaulted on the debt it used to finance the project, and thus cannot have recovered its investment.

Nor is it likely that Trafalgar will eventually pay off its debt with project revenues. Algonquin purchased the debt at a deep discount from face value. That market test suggests that the project equity was worthless, at least as of 1996. There is no evidence that the financial situation of the pro-

jects has improved since then. Algonquin subsequently tried to foreclose the liens on the projects – evidence that Trafalgar's ability to service the debt with project revenues has not improved. Finally, the projects are in Chapter 11 bankruptcy proceedings. From the record the parties presented on the subject, as happens in many reorganizations, the equity holders will ultimately receive nothing; therefore, those filings spell financial doom for Hydro's residual interest, if any exists in the projects. True, Trafalgar has recovered a large engineering malpractice judgment against Dunlevy. But Hydro has presented no evidence showing that this judgment is actually collectible, much less that the value of that judgment made the projects solvent.

Against this train of reasoning, Hydro marshals two arguments that require discussion, both of which are mistaken. Hydro first argues that Algonquin's purchase of the project debt was a sham transaction. The transaction, its argument continues, made Algonquin the effective owner of the projects, "served to conceal and cover-up massive financial fraud involving" the Trafalgar entities, and masked that Trafalgar has in fact recovered its capital investment in the projects. Reply Brief at 3–4. Hydro, however, has tendered to this Court no evidence verifying this vast conspiracy. The record, rather, suggests that Trafalgar did not recover its investment because Hydro's owner committed engineering malpractice and vastly overestimated the energy output of the projects. If Hydro's allegations of fraud, deceit, and all-around mischief are true, the bankruptcy court will address them in due course when it disposes of Hydro's adversarial filing. At any rate, even if Hydro were correct that Trafalgar has recovered its capital investment, Trafalgar still would not have met the energy output requirement. That independent condition precedent would prevent Hydro from receiving profit distributions regardless.

Nor is the "affidavit" of Hydro's bankruptcy attorney, which Hydro appends to its reply brief, sufficient evidence of the elaborate tale recounted in Hydro's brief. The affidavit is mostly legal argument sprinkled with repetitions of Hydro's far-flung allegations of financial improprieties. The exhibits

to the affidavit either are not probative of Hydro's allegations of misbehavior or are more unverified assertion. For example, the affidavit repeats the allegations of financial misbehavior that it makes in its appellate brief, citing as evidence an "exhibit" that consists solely of yet another affidavit by, once again, Hydro's bankruptcy attorney. This is bootstrapping. Something more than the assertions of a litigant's attorney is necessary to establish standing.

We are also not persuaded by Hydro's second argument – that Hydro has standing to petition this Court for review of FERC's order because Congress authorized it to petition FERC for relief in the first instance. Hydro points out, correctly, that the Federal Power Act permits "[a]ny person . . . complaining of anything done or omitted to be done by any licensee or public utility in contravention of the provisions of this Act [to] apply to the Commission by petition." 16 U.S.C. § 825e (2000). Hydro argues that this provision means that FERC's order denying their petition automatically "aggrieve[s]" them within the meaning of 16 U.S.C. § 825*l*(b), and thus entitles them to seek judicial review in this Court.

Hydro is wrong. Administrative agencies need not adjudicate only Article III cases and controversies, but federal courts must. If the petitioner has no Article III concrete interest in receiving the relief requested before the agency, this Court has held, Congress has no power to grant a petitioner a right to seek judicial review of an agency's decision to deny him relief. *Gettman v. DEA*, 290 F.3d 430, 433 (D.C. Cir. 2002); *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 27–28 (D.C. Cir. 2002). Because Congress cannot abrogate the requirements of Article III, as we explained in those cases, this principle applies even if Congress gave Hydro a right to seek judicial review of FERC's decision in this Court. *Gettman*, 290 F.3d at 433; *Fund Democracy*, 278 F.3d at 27–28. Any other rule would allow Congress to create federal jurisdiction by the simple expedient of granting any party – no matter how far removed from the true controversy – a right to petition the agency, and then a right to seek judicial review if the agency denied the request.

Article III does not permit Congress to expand the federal judicial function through such stratagems. If the party petitioning the agency lacks Article III standing, he has not been independently wronged simply because the agency denied his advisory request.

*Akins v. FEC*, 101 F.3d 731 (D.C. Cir. 1996) (en banc), *vacated by* 524 U.S. 11 (1998), on which Hydro relies, does not require a different result, even setting aside that the Supreme Court vacated it. In *Akins*, this Court held that a group of registered voters had standing to challenge the Federal Election Commission's refusal to force a political organization to disclose the names of its donors, its campaign contributions, and its expenditures. In the course of holding that the voters had prudential standing, this Court could not "glean any congressional intent to preclude members of that class from suing – so long as they filed a complaint with the FEC that was dismissed." *Id.* at 739. Hydro infers from this passage that it must have standing to seek judicial review of FERC's decision in federal court, because like Akins, it filed a complaint with FERC. The inference is mistaken. This case concerns whether Hydro has *constitutional* standing; the passage from *Akins* that Hydro stresses concerns *prudential* standing. The voters in *Akins* were injured-in-fact, according to the Supreme Court, because they were unable to obtain the requested information. 524 U.S. at 21. As discussed, Hydro has suffered no such injury here.

## Conclusion

For the reasons set forth above, we hold that petitioners have no standing to bring this action. Therefore, the petition for review is dismissed.