# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 15, 2021        Decided April 19, 2022

No. 21-5081

CAMPAIGN LEGAL CENTER AND CATHERINE HINCKLEY KELLEY,
APPELLANTS

v.

FEDERAL ELECTION COMMISSION, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02336)

*Tara Malloy* argued the cause for appellants. With her on the briefs was *Megan P. McAllen*.

*Aria C. Branch* argued the cause for appellees. With her on the brief was *Marc Erik Elias*.

Before: ROGERS and WALKER, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This case involves an action by Appellants Campaign Legal Center and Catherine Hinckley Kelley against the Federal Election Commission ("Commission" or "FEC"). They contend that the Commission's decision to dismiss their complaint alleging violations of the Federal Election Campaign Act ("Act" or "FECA") during the 2016 presidential election cycle by political committee Correct the Record and Hillary Clinton's campaign committee, Hillary for America, was contrary to law. Correct the Record and Hillary for America (together, "Intervenors") have intervened as defendants in this suit.

The matter giving rise to this case is Appellants' disagreement with the Commission's determination that expenditures by Correct the Record, made in coordination with the Clinton campaign, were exempt from disclosure as coordinated contributions to the campaign under an exception for unpaid internet communications. Appellants filed an administrative complaint with the FEC charging, *inter alia*, that Correct the Record and Hillary for America violated the Act by failing to disclose any of the in-kind contributions Correct the Record made to Hillary for America. Joint Appendix ("J.A.") 162-63. The Commission split 2-2 on whether there was reason to believe the joint undertaking gave rise to any "unreported[,] excessive[,] and prohibited in-kind contributions" from Correct the Record to the Clinton campaign and dismissed Appellants' complaint. J.A. 208, 252-55. Appellants then filed a complaint in the District Court to challenge the FEC's dismissal as contrary to law. The District Court dismissed Appellants' FECA claim for lack of standing.

The sole issue before this court is whether Appellants have standing to sue. We hold that they do. "The law is settled that a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the

information be publicly disclosed and there is no reason to doubt their claim that the information would help them." *Campaign Legal Ctr. & Democracy 21 v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2020) (per curiam) (quoting *Env't Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019)). Were Appellants to succeed on the merits of their claim, Correct the Record and Hillary for America would be obligated to disclose FECA-required factual information about the amounts of the contested coordinated, in-kind contributions. That "information would help [Appellants] (and others to whom they would communicate it) to evaluate candidates for public office, . . . and to evaluate the role that [Correct the Record's] financial assistance might play in a specific election." *FEC v. Akins*, 524 U.S. 11, 21 (1998).

Contrary to the findings of the District Court, the information Appellants seek is not currently known and it cannot be gleaned from the disclosures that have already been made by Correct the Record and Hillary for America. Correct the Record has disclosed its aggregated expenditures publicly, but it has not broken down its expenditures to show which were coordinated contributions to the Clinton campaign. There is no doubt that disaggregation of the existing disclosures would reveal the *amounts* of any coordinated contributions. It is also clear that the amounts that Correct the Record contributed to the Clinton campaign constitute factual information that is subject to disclosure under the statute. *See* 52 U.S.C. § 30104(b); 11 C.F.R. §§ 104.13(a), (b), 109.20(b), 109.21(b).

Accordingly, Appellants have demonstrated a quintessential informational injury directly related to their "interest in knowing how much money a candidate spent in an election." *Common Cause v. FEC*, 108 F.3d 413, 418 (D.C. Cir. 1997) (per curiam). As the Supreme Court made clear in *Akins*, "[t]he 'injury in fact' that [Appellants] have suffered consists

of their inability to obtain information—[including] campaign-related contributions and expenditures—that, on [Appellants'] view of the law, the statute requires that [Correct the Record and Hillary for America] make public." 524 U.S. at 21. This being so, Appellants also easily satisfy the causation and redressability requirements of Article III standing. *See id*. at 25. Accordingly, we reverse the District Court's dismissal for lack of standing and remand for further proceedings.

## I. BACKGROUND

### A. Legal Framework

Congress passed the Federal Election Campaign Act in 1971 with the aim of "remedy[ing] any actual or perceived corruption of the political process." *Akins*, 524 U.S. at 13-14. To further this goal, the Act uses three primary mechanisms: contribution limits, source restrictions, and disclosure requirements. First, it limits the amount a political committee can contribute to a candidate for federal office. 52 U.S.C. § 30116(a)(1)(A). A "contribution" under the Act includes any "gift . . . of money or anything of value made by any person for the purpose of influencing any election for Federal office." *Id.* § 30101(8)(A)(i). Contributions include not only payments made directly to a candidate, but also "coordinated" expenditures, which are those "made in cooperation, consultation[,] or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or a political party committee." 11 C.F.R. § 109.20. Coordinated expenditures are necessarily in-kind contributions, rather than direct monetary payments. Accordingly, utilizing political committee staff time, office space, or other resources in cooperation with a candidate counts as a contribution. *See id.*; 52 U.S.C. § 30101(8)(A)(i), (ii). This structure is designed to "prevent attempts to circumvent the Act through prearranged

or coordinated expenditures amounting to disguised contributions." *Buckley v. Valeo*, 424 U.S. 1, 47 (1976) (per curiam). In the 2016 election cycle, political committee contributions to candidates were capped at $2,700. Am. Compl. ¶ 38, J.A. 41.

Second, the Act restricts political committees from using money sourced from unions or corporations to make contributions to candidates. 52 U.S.C. § 30118(a), (b)(2). This ensures that unions and corporations cannot avoid direct contribution limits by funneling money to candidates through political committees. *See McConnell v. FEC*, 540 U.S. 93, 145-48 (2003).

Third, in an effort to "expos[e] large contributions and expenditures to the light of publicity," *Buckley*, 424 U.S. at 67, and ensure that voters "know exactly how a candidate's campaign is financed," S. Rep. No. 92-229, at 122 (1971), the Act imposes comprehensive disclosure requirements. Political committees are required to publicly report all expenditures over $200. *See* 52 U.S.C. § 30104(b)(5)(A); 11 C.F.R. § 104.3(b)(3)-(4). In addition, they must report contributions – in-kind, coordinated, or otherwise – made to any candidate. *See id.* § 30104(b)(4)(H)(i), (6)(B)(i), (iii). A candidate's "authorized committee," like Hillary for America, must disclose all in-kind, coordinated contributions it receives as both contributions and *expenditures*, because these donations function as resources spent by the campaign in furtherance of the election of the candidate. *Id.* §§ 30101(6), 30104(b); 11 C.F.R. §§ 104.13(a), 109.20(b), 109.21(b). Disclosures are made regularly in itemized reports to the FEC, and must include details like the dates, amounts, and purposes of the contributions and expenditures, as well as the name and address of a recipient candidate. *See* 52 U.S.C. § 30104(b); 11 C.F.R. §§ 104.13(a), 109.20(b), 109.21(b).

6

Of relevance here, certain *communications* made by political committees in concert with a candidate are considered in-kind contributions to the campaign. *See* 11 C.F.R. § 109.21(b). In particular, the Commission has promulgated rules designating political committees' *paid* communications – *e.g.*, paid online advertising – as coordinated campaign contributions subject to the aforementioned source, amount, and disclosure requirements. In contrast, *unpaid* internet communications – *i.e.*, those communications not placed for a fee – are exempt from those requirements. Internet Communications, 71 Fed. Reg. 18589, 18593-95 (Apr. 12, 2006); *see also* 11 C.F.R. §§ 100.94(a), 100.155(a)(1) (providing that uncompensated internet activity does not constitute a contribution or an expenditure).

The Act provides that any person who believes a violation of the Act has occurred may file a complaint with the Commission. 52 U.S.C. § 30109(a)(1). The Office of General Counsel reviews the complaint and any response and recommends to the Commission whether there is "reason to believe" a violation has occurred. *Id.* § 30109(a)(2), (3). The FEC Commissioners – six total, half from each of the two major political parties – then vote on whether there is "reason to believe" the Act was violated. *Id.* §§ 30106(a)(1), 30109(a)(2). If at least four Commissioners vote yes, the Commission will investigate; otherwise, the complaint is dismissed. *See id.* §§ 30106(c), 30109(a)(2). In the event of a deadlock, the "declining-to-go-ahead" Commissioners must issue a Statement of Reasons to serve as the basis for judicial review. *Common Cause v. FEC*, 842 F.2d 436, 449 (D.C. Cir. 1988). "Any party aggrieved" by the dismissal of a complaint may then seek judicial review. 52 U.S.C. § 30109(a)(8)(A).

## B. Factual Background

Campaign Legal Center is a non-profit watchdog group dedicated to "improving democracy and promoting representative, responsive, and accountable government for all citizens." Am. Compl. ¶ 15, J.A. 36. Catherine Hinckley Kelley is a registered voter and a director at Campaign Legal Center. Together, these Appellants filed an administrative complaint with the Commission in October 2016. They alleged that, during the run-up to the 2016 presidential election, political committee Correct the Record made, and Hillary Clinton's campaign committee Hillary for America accepted, millions of dollars in coordinated contributions in violation of the Act. Those payments were not disclosed as coordinated in-kind contributions by either group. The amount of these alleged contributions greatly exceeds the contribution limits in the Act, and the payments allegedly violated source restrictions as well.

The dispute here concerns whether these allegedly coordinated expenditures were exempt from disclosure. In the leadup to the election, Correct the Record was open about its coordination with the Clinton campaign in the media, but claimed that its spending was exempt from statutes and regulations governing coordination pursuant to the unpaid internet exception. Am. Compl. ¶¶ 63-66, J.A. 47-48; *see also, e.g.*, Matea Gold, *How a Super PAC Plans to Coordinate Directly with Hillary Clinton's Campaign*, Wash. Post (May 12, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/05/12/how-a-super-pac-plans-to-coordinate-directly-with-hillary-clintons-campaign/. Under Correct the Record's interpretation of the exemption, *input costs* associated with unpaid internet communications – such as the staff time, filming, computers, office space, and travel involved in producing unpaid internet communications – are exempt from disclosure. *See* Intervenor-Appellees' Principal and Resp. Br.

12-13. In line with its interpretation, Correct the Record disclosed $9,617,828.28 in total expenditures to the FEC as required, but did not designate any of that spending as in-kind coordinated contributions to the Clinton campaign. *See* FEC, *Correct the Record Financial Summary*, 2015-2016, https://www.fec.gov/data/committee/C00578997/?cycle =2016. Likewise, the Clinton campaign did not declare any of that spending as contributions or expenditures of its own.

In their administrative complaint to the Commission, Appellants challenged Intervenors' interpretation of the law, contending that expenditures by Correct the Record on items like "opposition research, message development, surrogate training and booking, professional video production, and press outreach for the benefit of the Clinton campaign" were not exempt under the unpaid internet communications exception. FEC Compl. ¶ 5, J.A. 117. Rather, they contended that these expenditures should have been reported as coordinated in-kind contributions and subject to the spending limitation restrictions in the Act.

The General Counsel of the FEC agreed with Appellants, finding that "[Correct the Record] raised and spent approximately $9 million on a wide array of activities, most of which are not fairly characterized as 'communications.'" First General Counsel's Report, *In re: Correct the Record*, MUR 6940 et al., p. 5 (FEC, Oct. 16, 2018), *reprinted in* J.A. 188. The General Counsel found that:

> the bulk of [Correct the Record]'s reported disbursements are for purposes that are not communication-specific, including payroll, salary, travel, lodging, meals, rent, fundraising consulting, computers, digital software, domain services, email services, equipment, event tickets, hardware,

insurance, office supplies, parking, and shipping in addition to payments for explicitly mixed purposes such as 'video consulting and travel' and 'communication consulting and travel.'

*Id.* at 9-10, J.A. 192-93.

The General Counsel concluded that both the external and internal communications of Correct the Record and the Clinton campaign evidenced coordination between the two entities on these activities. She rejected the argument that the expenditures were for unpaid internet communications and therefore exempt, reasoning that "[t]he fact that [activities] were subsequently transmitted over the internet does not retroactively render the costs of [those activities] a 'communication' cost." *Id.* at 20, J.A. 203. Accordingly, the General Counsel recommended to the Commission that there was "reason to believe" that Correct the Record and Hillary for America violated FECA by making coordinated contributions in excess of the prescribed limits, with funds from impermissible sources, and by failing to disclose those transactions as coordinated contributions.

When the Commission received the General Counsel's recommendation, it had only four Commissioners in place instead of the six that Congress authorized under FECA. This was due to a lack of executive appointments. The four Commissioners deadlocked two-two along party lines on the vote to decide whether there was "reason to believe" that illegal coordination had occurred. As a result, the Commission failed to achieve the four votes necessary to proceed. The two Republican Commissioners voted against finding there was reason to believe a violation occurred and issued a Statement of Reasons explaining their controlling decision. *See* Statement of Reasons of Vice Chairman Matthew S. Petersen and

Commissioner Caroline C. Hunter, *In re: Correct the Record*, MUR 6940 et al. (FEC, Aug. 21, 2019), *reprinted in* J.A. 256-73. They agreed with Correct the Record and Hillary for America that all "input costs" associated with unpaid internet communications are exempt from regulation under the Act. The Commission therefore dismissed the administrative complaint.

## C. Procedural History

In August 2019, Appellants filed suit in District Court to challenge the Commission's decision as (1) contrary to FECA, and (2) arbitrary and capricious under the Administrative Procedure Act. Still short two members, the Commission failed to garner the four affirmative votes necessary to defend the agency in this action, *see* 52 U.S.C. §§ 30106(c), 30107(a)(6), so the FEC did not enter an appearance in this case. However, the District Court, over Appellants' objection, permitted Correct the Record and Hillary for America to intervene as defendants.

At the start of the proceedings in District Court, the Intervenors filed a motion to dismiss. The District Court initially found that Appellants had standing to bring suit. *Campaign Legal Ctr. v. FEC*, 466 F. Supp. 3d 141, 150-54 (D.D.C. 2020). Analyzing whether an informational injury was present, the trial judge determined that Appellants "[had] no information as to the actual amount of money that, in [their] view, should have been considered a contribution or expenditure under the Act." *Id.* at 151. He further concluded that organizational standing existed because Campaign Legal Center plausibly alleged it was forced to divert organizational resources to obtain the information it was due by law. *Id.* at 154. On the merits, the trial judge concluded that the Commission's interpretation of the internet-communications

exception was contrary to law and "unduly compromise[d] the Act's purposes." *Id.* at 157 (quoting *Orloski v. FEC*, 795 F.2d 156, 164 (D.C. Cir. 1986)). The trial judge noted that, because the controlling Commissioners had decided that all expenditures for computer equipment, office space, software, web hosting, video equipment, placing a poll online, salaries, and the like were exempt from regulation as unpaid internet expenditures, the FEC determination would mean that "*any* expenditure could be exempted from regulation if it ultimately resulted in an unpaid internet communication." *Id.* at 149. The trial judge said that such an interpretation "creates a loophole that effectively vitiates the plain language of FECA." *Id.* at 158. The trial judge further found that the Commission's interpretation was "contrary to law" "because it ignored clear evidence of coordinated expenditures between [the Clinton campaign] and [Correct the Record] even apart from those claimed to be exempt under the internet-communications regulation." *Id.* at 159.

At summary judgment, however, the District Court "reverse[d] field" and "[came] out the other way" on the issue of Appellants' standing to pursue the FECA claim. *Campaign Legal Ctr. v. FEC*, 507 F. Supp. 3d 79, 82 (D.D.C. 2020). The court explained that it had "not sufficiently take[n] account of" the decision in *Wertheimer v. FEC*, 268 F.3d 1070 (D.C. Cir. 2001). 507 F. Supp. 3d at 85. It described *Wertheimer* as saying that a plaintiff lacks a cognizable informational injury where "the plaintiff 'do[es] not really seek additional facts[,] but only the legal determination that' the facts of which she is already aware amount to a legal violation." *Id.* at 84 (alterations in original) (quoting *Wertheimer*, 268 F.3d at 1075). The District Court then concluded that the information Appellants seek, including what portions of the already-disclosed expenditures were coordinated, "would not actually entail the disclosure of any information other than legal determinations of

coordination" and therefore did not support informational standing. *Id.* at 88. The District Court dismissed the FECA claim for lack of standing. *Id.* at 91. In a separate opinion, the District Court dismissed Appellants' Administrative Procedure Act claim as precluded by FECA. *Campaign Legal Ctr. v. FEC*, Civ. Action No. 19-2336, 2021 U.S. Dist. LEXIS 27082, at *3-10 (D.D.C. Feb. 12, 2021), *reprinted in* J.A. 310-17.

Appellants raised a timely appeal on standing for their FECA claim. They do not challenge the District Court's dismissal of their Administrative Procedure Act claim in this appeal.

## II. ANALYSIS

### A. Standard of Review

This court reviews a District Court decision on standing *de novo*. *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016). "The plaintiff bears the burden of invoking the court's subject matter jurisdiction, including establishing the elements of standing." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

### B. Standing to Redress Informational Injury

As noted above, the sole issue before the court is whether Appellants have an informational injury sufficient to support standing. To succeed, Appellants must show that the legal ruling they seek might lead to additional factual information that, on their view of the law, FECA requires the Intervenors to make public. *Akins*, 524 U.S. at 21. Intervenors Correct the Record and Hillary for America maintain that, because Correct the Record has already publicly disclosed all expenditures

made during the 2016 election in some form, Appellants would not obtain any new factual information if they prevailed on the merits. Appellants claim, however, that they still lack access to FECA-required information about the amounts, dates, recipients, and purposes of any coordinated expenditures and contributions Correct the Record made to Hillary for America. Appellants argue that if they succeed in this litigation, Correct the Record would be required to disaggregate its already-reported expenditures to show which portions of those expenditures were coordinated contributions and which were not. This would provide Appellants with new, pertinent information about the *amounts* Correct the Record contributed to the Clinton campaign, information that is currently unknown. We agree and therefore find that Appellants have established a cognizable informational injury.

### 1. The Applicable Law at Issue

To establish Article III standing, a plaintiff must show "the irreducible constitutional minimum" of "injury in fact," causation, and redressability. *Lujan*, 504 U.S. at 560-61. An injury in fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical" to suffice. *Id.* at 560 (internal quotations omitted). In the FECA context, "[t]o carry its burden of demonstrating a 'sufficiently concrete and particularized informational injury,'" the plaintiff must show that, in being denied access to the information, "it suffers . . . the type of harm Congress sought to prevent by requiring disclosure." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)).

In the seminal case *FEC v. Akins*, voters contested the Commission's determination that the American Israel Public

Affairs Committee ("AIPAC") was not a "political committee" under the definition provided in FECA. 524 U.S. at 15-18. Under plaintiffs' view of the law, AIPAC was a "political committee" and thus required under the Act to disclose the sources of its contributions and its spending. *Id.* at 15-16. The Supreme Court was clear in holding that because plaintiffs "fail[ed] to obtain information which must be publicly disclosed pursuant to a statute" under their view of the law, they "suffer[ed] an 'injury in fact.'" *Id.* at 21 (citing *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989)).

*Akins* also established that FECA grants voters a cognizable interest in information used "to evaluate candidates for public office," including information which reveals "the role that [a political committee]'s financial assistance might play in a specific election." *Id.* For that reason, in *Shays v. FEC*, 528 F.3d 914 (D.C. Cir. 2008), we recognized that an informational injury "no differen[t]" than "the injury deemed sufficient to create standing in *Akins*" is present when a voter is denied FECA-required disclosures about coordinated in-kind expenditures they believe must be reported as contributions to a candidate. *Id.* at 923 ("Here, as in *Akins*, Shays's injury in fact is the denial of information he believes the law entitles him to.").

Voter-related informational injuries of this sort are not generalized grievances because, "though widely shared, . . . [they are] sufficiently concrete and specific" to each voter to constitute an injury in fact. *Akins*, 524 U.S. at 24-25. Thus, "[t]he fact that other citizens or groups of citizens might make the same complaint . . . does not lessen [claimants'] asserted injury" where, as in *Akins* or *Shays*, the harm is concrete. *Id.* (quoting *Pub. Citizen*, 491 U.S. at 449-50); *see also Shays*, 528 F.3d at 923.

Of course, not every demand for information from the FEC is sufficient to establish Article III standing. We have recognized that "the nature of the information allegedly withheld is critical to the standing analysis." *Common Cause v. FEC*, 108 F.3d 413, 417 (D.C. Cir. 1997) (per curiam). The information sought must be that for which there is a statutory right and which "is related to [the plaintiff's] informed participation in the political process." *Nader v. FEC*, 725 F.3d 226, 230 (D.C. Cir. 2013). "If an organization has simply been 'deprived of the knowledge as to whether a violation of the law has occurred,' that 'injury' is no more than a generalized 'interest in enforcement of the law,' and does not support standing." *Jud. Watch, Inc. v. FEC*, 180 F.3d 277, 278 (D.C. Cir. 1999) (per curiam) (quoting *Common Cause*, 108 F.3d at 418). Thus, plaintiffs seeking information solely "to 'get the bad guys,' rather than disclose information," lack the sort of injury that sustains standing. *Common Cause*, 108 F.3d at 418.

In addition, plaintiffs must lack access to the information sought; a plaintiff cannot establish injury based on information that is already available "from a different source," disclosure of which would only result in "duplicative reporting." *Wertheimer v. FEC*, 268 F.3d 1070, 1075 (D.C. Cir. 2001). Similarly, if the information sought "would add only a trifle to the store of information about the transaction already publicly available," a plaintiff lacks standing. *Citizens for Resp. & Ethics in Wash. v. FEC*, 475 F.3d 337, 340 (D.C. Cir. 2007).

16

## 2. Applying the Law to the Facts of this Case

Turning to the case at hand, FECA clearly gives Appellants a statutory right to information about the amounts, dates, recipients, and purposes of any coordinated expenditures and contributions made by a political committee and received by a candidate's authorized committee. 52 U.S.C. §§ 30104(b), 30116(a)(7). And there is no serious dispute that, on Appellants' view of the law, many of Correct the Record and Hillary for America's coordinated expenses that the Commission found exempt from disclosure as "unpaid internet" expenses should be disclosed as in-kind contributions. If Appellants win on the merits, Correct the Record would be required to disaggregate its reporting to show the actual amounts of various expenditures that were in-kind contributions. Appellants would therefore gain access to FECA-required information about coordinated contributions from Correct the Record to the Clinton campaign. Finally, it is clear, as in *Akins*, "that the information would help [Appellants] . . . evaluate candidates for public office." 524 U.S. at 21. Accordingly, Appellants claim an injury in fact no different than that in *Akins*.

Intervenors' principal argument, with which the District Court agreed, is that no "additional factual information" would be disclosed if Appellants prevailed on the merits. Intervenor-Appellees' Principal and Resp. Br. 24. Rather, they argue, "'only the legal determination that' the facts [Appellants] already possess[] amount to a legal violation" would result. *Id.* at 30 (quoting *Wertheimer*, 268 F.3d at 1075). Intervenors contend that if Appellants prevail on the merits, Correct the Record's existing entries of expenditures would simply be moved from one line to another on the FEC reporting form, labeled as in-kind contributions, and described as benefiting

the Clinton campaign. This argument mischaracterizes the claims and information at stake.

Appellants' claim is that some not insignificant portion of Correct the Record's expenditures were coordinated in-kind contributions to the Clinton campaign. Appellants do not know the amounts, however, because Intervenors have not disclosed them. If Appellants won and certain expenditures were found not to be exempt as unpaid internet communication expenses, Correct the Record would be required under FECA to disaggregate the "lump sum" disbursements it has already reported for various overhead expenses (such as payroll, salaries, travel, lodging, rent, or fundraising) to reveal which portion of each expenditure funded coordinated activities. *See* Appellants' Reply Br. 10. This disaggregation would result in disclosure of the numerical *amounts* of any coordinated expenditures that were contributions to the Clinton campaign. Those amounts, currently unknown, constitute factual information core to Appellants' established interests in knowing "who is funding presidential candidates' campaigns," *Shays*, 528 F.3d at 923, and "how much money a candidate spent in an election," *Common Cause*, 108 F.3d at 418.

An example used by the District Court to suggest that no additional factual information would be disclosed if Appellants prevail actually illustrates that the opposite is true. In its expenditures, Correct the Record has disclosed that its founder and chairman David Brock was paid a biweekly salary of $4,521.56 in June 2016, described simply as "salary." Pls.' Opp'n to Correct the Record's and Hillary for America's Am. Mot. Dismiss Ex. D, ECF No. 27-4. Appellants maintain that "there is reason to believe that some portion of [Brock's] paycheck functioned as a disguised contribution to the campaign." *Id.* at 18. The District Court recognized that if the Commission concluded that fifty percent of Brock's time in a

two-week period was spent on coordinated activities, his salary payment would need to be disclosed as one non-coordinated salary expenditure of $2,260.78 and one in-kind contribution of $2,260.78. 507 F. Supp. 3d at 88. But the District Court then characterized this disclosure as "nothing more than the 'fact' of 'coordination,' which under *Wertheimer* is not a fact at all but rather a legal conclusion." *Id.* (internal quotation omitted). We disagree.

The District Court's analysis ignores that disaggregation of Brock's salary to show which portion was coordinated would in fact reveal the numerical amount of Correct the Record's coordinated contribution to the Clinton campaign, information political committees are required by statute to make public. Appellants do not now know that numerical amount, nor did the District Court; the "suppose[d]" fifty percent or $2,260.78 that might have been contributed in the court's example is made up; it is but a guess. *See id.* If Appellants prevail, the actual amount of Brock's salary that was a contribution to the Clinton campaign would have to be disclosed, along with disaggregated amounts for a myriad of other lump sum expenditures Appellants believe involved coordinated contributions. There is no doubt that those numerical amounts constitute factual information and that FECA requires them to be disclosed.

Intervenors argue that this court's decision in *Wertheimer* supports their position. They are mistaken because that case is not on point. Indeed, the facts in *Wertheimer* are markedly different from the facts in this case.

The principal holding in *Wertheimer* is that a plaintiff cannot establish injury based on information that is already available "from a different source" and that would only result in "duplicative reporting." 268 F.3d at 1075. The plaintiffs in

*Wertheimer* argued that coordinated expenditures by political parties were contributions to candidates (which was not yet established law) and sought disclosure of coordinated expenditures by presidential campaigns. *Id.* at 1071, 1074. But, the precise transactions that the plaintiffs sought in *Wertheimer* had already been reported by political parties *as coordinated expenditures*. *Id.* at 1075 (Garland, J., concurring) ("[P]olitical party committees are already required to report and to identify such coordinated expenditures . . . in their FECA filings."). In other words, the information sought by the plaintiffs in *Wertheimer* had already been "disaggregated" and marked as coordinated in the reports of political parties, so the plaintiffs had access to all the information they were seeking. If the plaintiffs in *Wertheimer* had won, they would have obtained "the same information from a different source." *Id.* at 1075. Therefore, *Wertheimer* would support Intervenors' position only if Correct the Record had disclosed its coordinated contributions to the Clinton campaign and designated them as such, and Appellants were simply seeking reciprocal disclosure from Clinton's campaign of those same transactions. *See id.* But the information at issue in this case has not been disaggregated, nor have the allegedly coordinated contributions been disclosed.

Finally, we reject Intervenors' argument that Appellants' view of the law would not require disaggregation of existing disclosures because Appellants believe "that *all* of Correct the Record's spending was coordinated." Intervenor-Appellees' Principal and Resp. Br. 35. This claim is belied by the record. Appellants have argued from the start that Correct the Record "coordinated *many* of its activities with the Clinton campaign," noting that "the total amount of [coordinated expenditures] is unknown." Am. Compl. ¶¶ 68-70, J.A. 48-50 (emphasis added). They have at no point argued that all of Correct the Record's expenditures were coordinated under the law, or that

none of Correct the Record's expenditures were exempt from disclosure under the internet exception. Therefore, Intervenors' contention that Appellants have attempted to manufacture standing by "revamp[ing]" their argument to claim that only some portion of Intervenors' activities were coordinated is baseless. Intervenor-Appellees' Principal and Resp. Br. 33.

The related concern expressed by the District Court that, if Appellants have standing here, a plaintiff "could seemingly manufacture standing in nearly every conceivable case" by "trimming its sails" and claiming to seek information about *some proportion* of already-disclosed expenditures, instead of whether those expenditures *as a whole* were coordinated, is equally misplaced. 507 F. Supp. 3d at 87-88. As discussed above, the inquiry from *Wertheimer* starts and stops with examining whether a plaintiff "only seek[s] the same information from a different source" such that no "additional facts" will result. 268 F.3d at 1074-75. Where, as here, a plaintiff demonstrates on the record that additional, statutorily-required information would be exposed under plaintiff's theory of the law that would serve an interest Congress sought to protect through disclosure, the plaintiff has undoubtedly established an informational injury under *Akins* and *Shays.* This is not an "end-run around *Wertheimer*," 507 F. Supp. 3d at 87, but a properly pled informational injury.

Moreover, the District Court failed to consider that mischief could easily occur with the approach that it endorsed. Were standing denied to those seeking disaggregated information that FECA plainly requires be disclosed whenever *aggregate* information is available, then political committees and campaigns could simply report information in increasingly broad, undifferentiated lump sums. Under the District Court's holding, even if a plaintiff's view of the law had merit, a plaintiff would have no right to seek non-trivial information

covered by FECA so long as the information was included as a part of some undifferentiated lump sum. There is nothing in the law to support this position. Thus, in this case, Appellants have no way of knowing what portion of Intervenors' lump sum disclosures consist of coordinated expenses. Such information is only known by parties (like Intervenors) who are responsible for making disaggregated disclosures under statute. Disaggregated FECA-required information cannot be deduced from aggregate, lump-sum disclosures of this kind.

Denying standing in circumstances of the sort raised by this case would permit easy workarounds for parties who seek to block the standing of persons who may raise legitimate requests for information covered by FECA. Moreover, the Intervenors' approach runs contrary to settled law that "a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." *Campaign Legal Ctr. & Democracy 21 v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2020) (per curiam) (quoting *Env't Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019)).

In sum, Appellants have established an informational injury in fact. Having done so, Appellants easily satisfy the remaining two constitutional standing requirements of causation and redressability. As in *Akins*, Appellants' injury is fairly traceable to the Commission's decision to dismiss their complaint. *See* 524 U.S. at 25. Should a reviewing court find that the Commission's determinations are contrary to law, the agency's action would be set aside and the case would likely redress Appellants' injury in fact. *See id.*; *see also Shays*, 528 F.3d at 923.

### III. Conclusion

For the reasons given above, we hold that Appellants have standing to challenge the Commission's dismissal of their complaint. Appellants have established that, because of this dismissal, they lack access to FECA-required information concerning money spent by the Clinton campaign. If their challenge succeeds, they will likely gain access to that information, which will no doubt "help them . . . evaluate candidates for public office." *Akins*, 524 U.S. at 21. Accordingly, the decision of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.