# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 16, 2023          Decided July 9, 2024

No. 22-5336

CAMPAIGN LEGAL CENTER AND CATHERINE HINCKLEY
KELLEY,
APPELLEES

v.

FEDERAL ELECTION COMMISSION,
APPELLANT

HILLARY FOR AMERICA AND CORRECT THE RECORD,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02336)

———

*Greg J. Mueller*, Attorney, Federal Election Commission, argued the cause for appellant. With him on the briefs was *Kevin A. Deeley*, Associate General Counsel.

*Michael A. Columbo* was on the brief for *amicus curiae* Lee E. Goodman, Former FEC Chair and Commissioner, in support of appellant.

2

*Tara Malloy* argued the cause for appellees Campaign Legal Center and Catherine Hinckley Kelley. With her on the brief were *Megan P. McAllen* and *Alexandra Copper*.

Before: PILLARD and CHILDS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Congress enacted the Federal Election Campaign Act to remedy actual and perceived corruption in the electoral process. The Act improves electoral accountability by publicizing candidates' financial backers and capping amounts they can give. To those ends, it requires individuals and organizations to limit and disclose the amounts they spend for "anything of value" with the purpose of influencing a federal election in cooperation with or at the suggestion of a political candidate or campaign. 52 U.S.C. § 30101(8)(A). The Act and its implementing regulations provide that coordinated expenditures for electoral advocacy communications—via radio, television, or newspaper advertisements, for example—are subject to the Act's dollar limits and disclosure requirements. *Id.* § 30116(7)(B)(i); 11 C.F.R. §§ 109.20(b), 109.21. So is the estimated "usual and normal value" of any coordinated gift to the same effect, even if, for example, it was given by a media owner who did not have to shell out money to provide it. 11 C.F.R. §§ 104.13(a), 100.52(d)(1).

The same restrictions apply to paid advertising or placement on the internet—"communications placed or promoted for a fee on another person's website." *Id.* § 100.26. But, unlike advertising in traditional media, promoting a candidate's election on widely viewed internet platforms like blogs and social media sites is often free of charge. The Federal

Election Commission accounted for that in a 2006 rule known as the "internet exception." The Commission does not require an individual or political committee to estimate and report the marginal costs of blogging or social media posting in coordination with a campaign, but instead exempts unpaid "communications over the Internet" from the contribution limitations and disclosure requirements that otherwise apply to coordinated political advocacy. *Id.*

Leaning heavily on that internet exemption, political action committee Correct the Record set out to engage in a wide range of coordinated activities to support Hillary Clinton's 2016 presidential campaign. In an administrative complaint filed with the Federal Election Commission, nonprofit watchdog Campaign Legal Center alleges that Correct the Record spent close to $6 million in coordination with the Clinton campaign during the lead-up to the 2016 election, including to conduct polls, hire teams of round-the-clock fact-checkers, and connect Clinton media surrogates with radio and television news outlets. Correct the Record publicized that it was coordinating all these activities with the Clinton campaign. But it characterized all of the committee's myriad expenditures—from staff salaries and travel expenses to the cost of commissioning polls and renting offices—as "inputs" to unpaid communications over the internet. For that reason, neither Correct the Record nor the Clinton campaign designated any of Correct the Record's expenditures as contributions to the campaign.

This appeal concerns whether the Federal Election Commission dismissed Campaign Legal Center's administrative complaint based on an indefensibly broad interpretation of the internet exemption. It also asks whether the Commission arbitrarily ignored plausible allegations, including Correct the Record's own public pronouncements,

that Correct the Record planned to coordinate all its expenditures with the Clinton campaign.

We hold that the Commission acted contrary to law in dismissing the complaint. Because we conclude that the internet exemption cannot be read to exempt from disclosure those expenditures that are only tangentially related to an eventual internet message or post, the Commission's reading of the internet exemption stretches it beyond lawful limits. As to those expenditures that it deemed not to be covered by the internet exemption, the Commission acted contrary to law in dismissing the complaint for want of reason to believe the relevant expenditures were coordinated with the campaign, despite plausible allegations that Correct the Record coordinated *all* its expenditures with Hillary for America—and openly acknowledged doing so.

## BACKGROUND

We described the statutory, regulatory, and procedural background of this case in *Campaign Legal Center v. Federal Election Commission*, 31 F.4th 781, 784-88 (D.C. Cir. 2022) (*CLC I*). What follows is a summary of the context most relevant at this posture, drawing in part on our description in *CLC I*.

### A

In service of "remedy[ing] any actual or perceived corruption of the political process," the Federal Election Campaign Act (FECA or the Act) imposes contribution limits and disclosure requirements on candidates, individual donors,

and political committees. *FEC v. Akins*, 524 U.S. 11, 14 (1998); *see CLC I*, 31 F.4th at 784.

FECA's contribution limits set a dollar-value cap—$2,700 during the 2016 election cycle—on the contributions a political committee or individual can make to any one candidate or his authorized campaign committee. 52 U.S.C. § 30116(a)(1)(A); *CLC I*, 31 F.4th at 784. Contributions include gifts and money given directly to a campaign, 52 U.S.C. § 30101(8)(A)(i), but also coordinated expenditures—money spent by committees and individuals "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents," *id.* § 30116(a)(7)(B)(i); *see FEC v. Colo. Repub. Fed. Campaign Comm.*, 533 U.S. 431, 438 (2001). Any coordinated "purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value made by any person for the purpose of influencing any election for Federal office" is accordingly regulated as if it were a cash contribution. 52 U.S.C. § 30101(9)(A)(i).

That "functional, not formal, definition of 'contribution,'" *Colo. Repub. Fed. Campaign Comm.*, 533 U.S. at 438, is designed to "prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions," *Buckley v. Valeo*, 424 U.S. 1, 47 (1976) (per curiam). The Act recognizes that "expenditures made after a 'wink or nod'"—or with more explicit coordination—"often will be 'as useful to the candidate as cash.'" *McConnell v. FEC*, 540 U.S. 93, 221 (2003) (quoting *Colo. Repub. Fed. Campaign Comm.*, 533 U.S. at 442, 446), *rev'd on other grounds, Citizens United v. FEC*, 558 U.S. 310 (2010). For that reason, the money an individual (or committee) spends creating a political advertisement in consultation with the candidate and airing it on television is a regulated campaign contribution, just like the money given

directly to a candidate to enable her to produce and air the advertisement herself.

In addition to per-donor, per-election cycle contribution limits, FECA imposes comprehensive disclosure requirements. Disclosure is essential "to expose large contributions and expenditures to the light of publicity and ensure that voters know exactly how a candidate's campaign is financed." *CLC I*, 31 F.4th at 784 (formatting modified). Political committees, commonly known as "PACs"—defined as any group of persons that receives or spends more than $1,000 on electoral advocacy during a calendar year, *see* 52 U.S.C. § 30101(4)(A)—must publicly report any expenditure of more than $200, whether coordinated or not. *See id.* § 30104(b)(5)(A). They must also report all contributions of any amount made to a candidate or his campaign. *Id.* § 30104(b)(4)(H)(i), (6)(B)(i).

The Act imposes a twin obligation on the candidate's authorized committee—the "principal campaign committee" (or, for simplicity, "campaign") authorized to make and receive expenditures on behalf of the candidate. *Id.* § 30101(6). The campaign must disclose as separate line items all contributions from political committees and all expenditures "made to meet candidate or committee operating expenses." *Id.* § 30104(b)(4)(A); *see id.* § 30104(b)(2)(D). FEC regulations provide, moreover, that a candidate must report as his own expenditure what anyone else spends in coordination with him, unless the expenditure is otherwise exempted. 11 C.F.R. § 109.20(b).

All these disclosures must be made regularly in itemized public reports to the Federal Election Commission (FEC or Commission), and must include details like the dates, amounts, and purposes of the contributions and expenditures, as well as

the name and address of the recipient campaign. 52 U.S.C. § 30104(b).

FEC regulations set out special rules for one type of coordinated expenditure relevant to this case: those "made for a coordinated communication under 11 C.F.R. [§] 109.21." 11 C.F.R. § 109.20(b). A communication is considered a "coordinated communication," and therefore reportable in-kind donation, if, among other criteria, it is coordinated political advocacy that is communicated "by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public, or any other form of general public political advertising." *Id.* § 100.26; *see id.* § 109.21(c).

Payments for coordinated communications "made for the purpose of influencing a Federal election," are, like other coordinated expenditures, "contributions" to the candidate or her campaign that must be publicly disclosed. *Id.* § 109.21(b). They are also subject to the per-election-cycle ceiling on how much a donor may contribute to a single candidate. *Id.* As relevant here, that means that a candidate's campaign committee (like Hillary for America) must disclose the money a political committee (like Correct the Record) spends on airtime for a coordinated radio advertisement. The campaign must disclose it both as a contribution it received and as an expenditure it made. *Id.* §§ 104.13(a), 109.21(b). And the political committee must disclose it as a contribution to the campaign. *Id.* § 109.21(b). In other words, the law treats money spent on a coordinated communication as equivalent to

money given to a candidate that she then spends on her own political advertising.

But an FEC rule affords different treatment to communications over the internet that are not "placed or promoted for a fee on another person's website . . . or advertising platform"—like blog or social media entries that the poster does not have to pay to publish on the internet. *Id.* § 100.26. That rule, known as the "internet exemption," exempts unpaid political ad postings on the internet from the scope of covered political-advocacy communications; such posts are therefore not "coordinated communications" under the regulations. *Id.* The upshot of this so-called "internet exemption," which lies at the heart of this case, is that such unpaid internet communications are not themselves in-kind contributions. The campaign does not need to assign a monetary value to an unpaid blog entry or a post on a political committee's own website and disclose it as an in-kind contribution on its reports to the FEC, even if the entry or post is written in coordination with the campaign, and even if its publication is valuable to the candidate.

Another portion of the regulations making up this "internet exemption" provides that, "[w]hen an individual or group of individuals, acting independently or in coordination with any candidate, authorized committee, or political party committee, engages in Internet activities [like messaging, blogging, or maintaining a website] for the purpose of influencing a Federal election," neither the individual's "uncompensated personal services related to such Internet activities" nor her "use of equipment or services for uncompensated Internet activities" are an "expenditure" or "contribution" by that individual. *Id.* § 100.94 (contribution); *id.* § 100.155 (expenditure). A member of the public who pays for WiFi at an internet café to write and post a blog entry in coordination with a campaign

need not disclose as a campaign contribution the money he spent for the WiFi. *See* Internet Communications, 71 Fed. Reg. 18589, 18605 (Apr. 12, 2006). But, the Commission's rulemaking clarifies, "a political committee's purchase of computers for individuals to engage in Internet activities for the purpose of influencing a Federal election remains an 'expenditure' by the political committee," as does any salary the committee pays such individuals. *Id.* at 18606.

When the Commission promulgated them, it described those rules as "intended to ensure that political committees properly finance and disclose their Internet communications, without impeding individual citizens from using the Internet to speak freely regarding candidates and elections." *Id.* at 18589.

**B**

The six-member Federal Election Commission bears primary responsibility to enforce the Federal Election Campaign Act. 52 U.S.C. § 30106. The Act allows any person to file a complaint with the Commission reporting a violation of the statute, along with certain other federal election laws. *Id.* § 30109(a)(1). The FEC's Office of General Counsel reviews each complaint and any response from the alleged violator and recommends to the Commission whether the complaint provides "reason to believe" a violation has occurred. *Id.* § 30109(a)(2). The commissioners then vote on whether there is such "reason to believe." *Id.*

If at least four commissioners—*i.e.*, a bipartisan majority of the six-member body—vote in favor, the Commission will investigate and, depending on the investigation's results, vote in favor of finding "probable cause to believe" that the accused person or entity violated the law and attempt conciliation. *Id.* § 30109(a)(3)-(4). If conciliation fails, the Commission may, on the affirmative vote of four members, file a civil action in

federal court to enforce the violation, *id.* § 30109(a)(6)(A); at that stage, lack of majority support to sue will typically result in administrative dismissal. A majority of commissioners can also vote to dismiss a complaint at any time. *Id.* § 30109(a)(1); *see also id.* § 30106(c).

As relevant here, "[a]ny party aggrieved" by the Commission's dismissal of a complaint for want of reason to believe can seek review in federal court. *Id.* § 30109(a)(8)(A). If the court concludes that the naysayers on the Commission held the complaint inadequate on grounds that were contrary to law or arbitrary and capricious, the court may "declare that the dismissal of the complaint . . . is contrary to law, and may direct the Commission to conform with such declaration within 30 days." *Id.* § 30109(a)(8)(C); *see Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986). If the Commission remains unwilling to move forward on the complaint, no court will require it to do so. Rather, if the Commission fails to act on the court's order within 30 days, FECA allows the private complainant to initiate, in its own name, a civil action against the relevant committee or individual to seek to remedy the violation involved in the original complaint. 52 U.S.C. § 30109(a)(8)(C).

To facilitate judicial review under section 30109(a)(8)(A), we have held that, where the Commission deadlocks—that is, fails to garner four votes to proceed with enforcement—and thereafter dismisses a complaint, the commissioners who voted against proceeding must issue a statement explaining their votes. *Common Cause v. FEC*, 842 F.2d 436, 449 (D.C. Cir. 1988) (citing *Democratic Cong. Campaign Comm. v. FEC*, 831 F.2d 1131, 1132 (D.C. Cir. 1987)). We refer to a non-majority of commissioners who vote against proceeding as the "controlling" or "blocking" commissioners. Their statement of reasons is intended to explain why those commissioners saw

no reason to believe a violation occurred, and thereby aid the reviewing court to "intelligently determine whether the Commission is acting 'contrary to law.'" *Democratic Cong. Campaign Comm.*, 831 F.2d at 1132 (citation omitted).

## C

## 1

Campaign Legal Center is a nonpartisan watchdog group with a mission of "improving democracy and promoting representative, responsive, and accountable government for all citizens." Am. Compl. ¶ 15 (Joint Appendix (J.A.) 41). In October 2016, Campaign Legal Center and its director, Catherine Hinckley Kelley (hereinafter referred to collectively as Campaign Legal Center or plaintiff) filed an administrative complaint with the FEC against political action committee Correct the Record and Hillary Clinton's principal campaign committee, Hillary for America. Campaign Legal Center alleged that, in the lead-up to the 2016 presidential election, Correct the Record made, and the campaign accepted, up to $5.95 million in coordinated expenditures without disclosing them.

The key dispute is whether those expenditures were coordinated, and, if so, whether they were exempted from FECA's requirements by the Commission's "internet exemption."

When Correct the Record split from its parent political action committee in 2015, it declared that, because it would "not be engaged in paid media" like radio or television advertisements, none of its activities would be subject to the disclosure requirements or contribution limits that typically apply to coordinated expenditures. Campaign Legal Center Complaint to the FEC (FEC Compl.) ¶ 12 (J.A. 117) (quoting

Press Release, Correct the Record, Correct the Record Launches as New Pro-Clinton SuperPAC (May 12, 2015)). The FEC complaint also pointed to the Washington Post's reporting that "Correct the Record believes it can avoid [FECA's] coordination ban by relying on a 2006 Federal Election Commission regulation that declared that content posted online for free, such as blogs, is off limits from regulation." *Id.* ¶ 9 (J.A. 116) (quoting Matea Gold, *How a Super PAC Plans to Coordinate Directly with Hillary Clinton's Campaign*, Wash. Post. (May 12, 2015), https://perma.cc/XA6Z-XFRX).

In its complaint to the Commission, Campaign Legal Center alleged that Correct the Record claimed all its spending came within the internet exemption, and that Correct the Record accordingly spent close to $6 million in coordination with Hillary Clinton's campaign without designating any of that spending as a contribution to the Clinton campaign. Campaign Legal Center alleged that Correct the Record undertook various substantial projects with that $6 million, including the following:

> *Benghazi Hearing War Room*: Correct the Record staffed a 30-person "war room" to publicly defend Hillary Clinton in real time during her testimony in late October 2015 before the House Select Committee on Benghazi. FEC Compl. ¶ 28 (J.A. 123). Those paid staffers "put out 18 news releases" about Clinton's testimony during the morning hours, "flood[ing] the emails of Washington reporters with a running, blow-by-blow critique" of the Committee. *Id.* ¶ 29 (J.A. 124).

> *Real-Time Debate Polling Team*: The next month, Correct the Record commissioned a polling firm to

conduct a poll during the November 2015 Democratic debate between Hillary Clinton and Bernie Sanders; the poll was later posted on the firm's website and distributed to media. *Id.* ¶ 31 (J.A. 126).

*Online Defense Team*: Later, as the primary campaign was heating up in April 2016, Correct the Record announced its intention to invest more than $1 million into the "Barrier Breakers 2016 digital task force," hiring "former reporters, bloggers, public affairs specialists, [and] designers" to "go after Clinton critics" online. *Id.* ¶ 40 (J.A. 130-31).

*Paid Surrogates Program*: Correct the Record hired QRS Newsmedia, a media consulting firm, "to help oversee an aggressive surrogate booking program, connecting regional and national [campaign] surrogates"—popular public figures aligned with the candidate—"with radio and television news outlets across the country in support of Hillary Clinton." *Id.* ¶ 51 (J.A. 135).

*Fact Checker Team*: Correct the Record's paid "researchers, communications experts and digital gurus monitor[ed]" myriad television news feeds, newspapers, and social media sites for "disparaging or misleading remarks about Clinton" and fought back with "point-by-point fact-checks quickly disseminated to the news media." *Id.* ¶ 61 (J.A. 140).

By the end of the campaign, Correct the Record had allegedly created near-daily "lengthy research memos, professionally

produced videos, press releases, and other materials" praising Clinton and attacking her opponents. *Id.* ¶ 67 (J.A. 142).

In disclosure reports it filed with the FEC, Correct the Record represented that it spent close to $10 million during the 2016 election cycle. *CLC I*, 31 F.4th at 786. But it did not specifically detail or designate any of that spending as a contribution to the Clinton campaign. *Id.* Nor did the Clinton campaign itself declare any of Correct the Record's expenditures as made on Clinton's behalf, as is generally required for campaign contributions. *Id.*

In Campaign Legal Center's view, that non-disclosure violated FECA and Commission regulations. Correct the Record claimed the mantle of the internet exception, but Campaign Legal Center asserts that most of Correct the Record's coordinated activities "did not take place on the Internet at all." FEC Compl. ¶ 93 (J.A. 153).

**2**

The Commission's General Counsel recommended the Commission find reason to believe that Correct the Record and Hillary for America violated FECA because Correct the Record's activities were "systematically coordinated" with Hillary for America, and most of them could not "fairly be described as [spending] for 'communications.'" General Counsel Report at 16, 20-21 (J.A. 196, 200-01). The bulk of the reported disbursements, the General Counsel explained, were for non-communication-specific purposes. Some of the expenditures went toward salaries, travel, lodging, meals, rent, and computers; others were "for explicitly mixed purposes such as 'video consulting and travel' and 'communication consulting and travel.'" *Id.* at 9-10 (J.A. 189-90). None of

those expenditures, in the General Counsel's view, fell within the internet exception.

The General Counsel identified as illustrative Correct the Record's commissioning of a poll during the November 2015 Democratic debate. The General Counsel explained that the fact that the results of the poll were "subsequently transmitted over the internet" did not "retroactively render the costs of the polling" an exempt expenditure made for a coordinated communication. *Id.* at 20 (J.A. 200). The General Counsel saw the costs of commissioning that poll, like most of Correct the Record's expenditures, as a reportable in-kind contribution. Accordingly, the General Counsel recommended that there was "reason to believe" that Correct the Record made—and Hillary for America accepted—"unreported excessive and prohibited in-kind contributions." *Id.* at 25 (J.A. 205).

When the Commission reviewed the General Counsel's recommendation, it had only four commissioners in place; the departures of several commissioners before their terms expired and the failure to promptly replace them meant that two of the six seats were vacant. *See CLC I*, 31 F.4th at 787. Those four commissioners deadlocked two to two along party lines on the "reason to believe" vote, leaving the FEC short of the four votes needed to authorize an investigation. *Id.* As required by our decision in *Democratic Congressional Campaign Committee v. FEC*, 831 F.2d 1131 (D.C. Cir. 1987), the two commissioners who voted against finding a "reason to believe" issued a statement of reasons explaining their reasoning.

In their statement, the blocking commissioners acknowledged that "expenditures made by any person in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate . . . shall be considered . . . a contribution to such candidate." Statement of Reasons at 9

(J.A. 275) (quoting 52 U.S.C. § 30116(a)(7)(B)(i)). They nevertheless asserted that the FEC's "internet exemption" dictates that money Correct the Record spent for its unpaid "online communications" is exempt from the Act's contribution limits and disclosure requirements. *Id.* at 11 (J.A. 277). In the controlling commissioners' view, the internet exemption mandates that the "input costs"—money spent on activities one result of which is an internet communication— "are treated as in-kind contributions only when the [resulting] internet communication itself is an in-kind contribution"—*i.e.*, only when there is a fee charged for the online posting itself. *Id.* at 12 (J.A. 278). So they concluded that all "input costs" to unpaid internet messages or posts are exempt.

In other words, although the costs of commissioning a poll plainly would not be exempt if Correct the Record bought space to advertise the poll's results on the New York Times website or in the newspaper's print edition, the blocking commissioners insisted Correct the Record's expenditures were exempt from disclosure because the polling firm later posted the poll without charge on its website. So, too, in their view, does the internet exemption apply to the salary of a blogger who "go[es] after Clinton critics" on social media, *see, e.g.*, FEC Compl. ¶ 40 (J.A. 130-31), even though the salary of a staffer who communicates only with news reporters for earned news coverage is not. Moreover, to the extent certain money—like staff salaries or office rent—went to both internet communications and other activities, the commissioners declined to fault Correct the Record's failure to apportion such expenses and "exempt[] [from disclosure and contribution limits] only those component fees deemed essential for the internet communication's placement." Statement of Reasons at 13 (J.A. 279). Because they thought such accounting would "eviscerate the internet exemption and the deliberate policy

decisions behind it," *id.* (J.A. 279), they treated all those shared overhead expenditures as fully exempt.

Notwithstanding their capacious construction of the internet exemption, the controlling commissioners rejected Correct the Record's representation that, because it would not "be engaged in paid media," all of its activities were exempt from campaign finance laws. *See* FEC Compl. ¶ 12 (J.A. 117) (quoting Press Release, *supra*). The commissioners recognized that some of Correct the Record's activities were unrelated to internet communications—including Correct the Record's training of media surrogates, its opposition research activities, and the resources expended contacting reporters. The controlling commissioners concluded that Correct the Record did not have to report those expenditures for a different reason: They viewed as insufficient the allegations and supporting information that Correct the Record coordinated those non-internet-related activities with Hillary for America.

In the face of Correct the Record's announced intention to "work[] directly with the campaign" on all its pro-Clinton advocacy, FEC Compl. ¶ 27 (J.A. 123), the blocking commissioners reasoned that "coordination" was not a "status" that attached to Correct the Record once it declared an intent to coordinate with the campaign, Statement of Reasons at 16 (J.A. 282). Instead, they concluded that any finding of coordination would require a "transaction-by-transaction assessment" determining that "specific [coordinated] conduct occurred with respect to particular expenditures." *Id.* (J.A. 282). That detailed assessment was, in their view, lacking here. The allegations and information before the Commission instead generally suggested that, to the extent there was coordination, Correct the Record "limited its interactions with Hillary for America to the very communications that the Commission had

previously decided not to regulate," *id.* (J.A. 282)—exempt internet communications.

The Commission's Chair issued a dissenting statement of reasons. In her view, many of Correct the Record's activities— including paying staff salaries, hiring trackers, commissioning a private polling firm, and hiring outside consulting firms— were "off the internet" and thus not exempt from disclosure requirements and contribution limits. Dissenting Statement of Reasons at 6-7 (J.A. 290-91). And even at the complaint stage, the information before the Commission "in the form of press releases and public interviews with [Correct the Record's] officers," provided reason to believe those activities were sufficiently coordinated to meet the statutory definition of a "contribution" subject to disclosure. *Id.* at 5 (J.A. 289).

In the absence of a majority to move forward, the four commissioners eventually voted unanimously to close the file and thereby dismiss the case.

**D**

In August 2019, Campaign Legal Center filed suit in district court to challenge, as relevant here, the Commission's dismissal of the administrative complaint as contrary to FECA. Still short two members, the divided four-member Commission failed to garner the four affirmative votes necessary even to appear in court to defend the agency. *See* 52 U.S.C. §§ 30106(c), 30107(a)(6). Over Campaign Legal Center's objection, the district court permitted Correct the Record and Hillary for America to intervene as defendants.

On consideration of the parties' cross-motions for summary judgment, the district court initially held that the plaintiff lacked standing to challenge the FEC's nonenforcement decision, reasoning that Campaign Legal

Center had "no cognizable interest in learning which [of Correct the Record's] activities were in fact coordinated" with the Clinton campaign. *See Campaign Legal Ctr. v. FEC*, 507 F. Supp. 3d 79, 85 (D.D.C. 2020) (internal quotation marks omitted).

We reversed and remanded. *CLC I*, 31 F.4th at 793. If Campaign Legal Center prevailed in its suit and the FEC eventually enforced the FECA violations against Correct the Record and Hillary for America, we explained, FECA and Commission regulations would require Correct the Record and Hillary for America to each "disaggregate its reporting to show the actual amounts of various expenditures" that were coordinated with and therefore "in-kind contributions" to the Clinton campaign. *Id*. at 790. Then, Campaign Legal Center would gain access to "FECA-required information," including details as to coordination, that was currently unknown to them—which would, in turn, help it "evaluate candidates for public office." *Id.* (quoting *FEC v. Akins*, 524 U.S. 11, 21 (1998)). Campaign Legal Center had accordingly established an informational injury that was "fairly traceable" to the Commission's dismissal of their complaint: "Should a reviewing court find that the Commission's determinations are contrary to law, the agency's action would be set aside and the case would likely redress [plaintiff's] injury in fact." *Id.* at 793.

On remand, the district court ruled in plaintiff's favor, holding the Commission's dismissal of the complaint was contrary to law. *Campaign Legal Center v. FEC*, 646 F. Supp. 3d 57, 59 (D.D.C. 2022). The court held that the controlling commissioners' statement of reasons espoused an impermissible interpretation of FECA by "allow[ing] any coordinated expenditure to escape treatment as a contribution, so long as that expenditure somehow informs a blog post or improves a tweet." *Id.* at 64. The court also held that it was

arbitrary and capricious, and therefore contrary to FECA, for the commissioners to ignore "the overwhelming and public evidence" that Correct the Record operated with the principal purpose of coordinating all of the relevant activities with the Clinton campaign. *Id.* at 67. Accordingly, the district court remanded the matter to the Commission "to sketch the bounds of the internet exemption and to more fully analyze the facts before it," and directed the Commission to conform with its decision within 30 days. *Id.* at 69 (citing 52 U.S.C. § 30109(a)(8)(C)).

Two weeks after the district court issued its summary judgment order, the FEC entered an appearance in the district court. It immediately filed a notice of appeal and a motion to stay the remand order pending appeal. While that stay motion was pending, the 30-day remand window elapsed and Campaign Legal Center initiated a private suit against Correct the Record and Hillary for America under 52 U.S.C. § 30109(a)(8)(C). The district court denied the stay. *Campaign Legal Center v. FEC*, No. 19-cv-2336, 2023 WL 6608997, at *3-4 (D.D.C. Feb. 1, 2023). The imminent harm the FEC had cited in support of a stay was loss of the exclusivity of its civil enforcement authority if a private case were initiated but, given the expiration of the 30-day window for the Commission to conform with the district court's judgment and Campaign Legal Center's initiation of a private suit, the district court concluded "that ship has sailed." *Id.* at *3. Hillary for America did, however, persuade the district court to stay Campaign Legal Center's private suit against Correct the Record and Hillary for America pending resolution of this appeal. *See Campaign Legal Ctr. v. Correct the Record*, No. 23-cv-75, 2023 WL 2838131, at *5 (D.D.C. Apr. 2, 2023).

We have jurisdiction under 28 U.S.C. § 1291. We review the district court's grant of summary judgment *de novo*. *See*

*Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013).

## DISCUSSION

The Commission urges reversal, arguing that it acted consistently with FECA and Commission regulations. Campaign Legal Center asserts that the Commission's appeal is moot and forfeited, and alternatively defends the district court's decision on the merits. We address the threshold questions of mootness and forfeiture before turning to the merits of the Commission's dismissal.

The Commission presses another argument on appeal, urging this court to limit the scope of the district court's remand to the agency. The Commission casts this as a jurisdictional matter because, in its view, Campaign Legal Center lacks standing to seek relief in federal court regarding claims that Correct the Record and Hillary for America violated FECA's contribution limits or source restrictions. The Commission is mistaken. There is no such jurisdictional issue before this Court because the question posed by the Commission was not decided by the district court, nor is it before us. Campaign Legal Center merely asks this court to hold that the Commission incorrectly dismissed their complaint based on an erroneous interpretation of the internet exemption. Because what the Commission characterizes as a standing argument is nothing more than a question regarding the scope of potential relief, we address that argument below, in connection with our consideration of the appropriate remedy.

22

**A**

**1**

Campaign Legal Center contends this appeal is moot because the district court's remand order has no "continuing legal effects" on the Commission's rights or obligations. Pl.'s Br. 32. "[T]he [mootness] doctrine requires a federal court to refrain from deciding [a case] if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 645 (D.C. Cir. 2011) (quoting *Clarke v. United States*, 915 F.2d 699, 700-01 (D.C. Cir. 1990)).

Plaintiff's theory of mootness is that the Commission, having defaulted on its opportunity to "conform" within 30 days of the district court's contrary-to-law ruling, is no longer a valid participant in their private right of action on remand. More specifically, they argue as follows: 52 U.S.C. § 30109(a)(8)(C) affords the Commission 30 days to "conform" with a court's declaration that the agency's dismissal was "contrary to law." The statute also provides that, if the Commission does not act during that 30-day window, the complainant (here, Campaign Legal Center) can, in its own name, bring a "civil action to remedy the violation involved in the original complaint." 52 U.S.C. § 30109(a)(8)(C). Because that 30-day remand window expired in December 2023 before the district court acted on the FEC's motion to stay, and because Campaign Legal Center has, in the meantime, initiated a private lawsuit against Correct the Record and Hillary for America, Campaign Legal Center asserts that it would be impossible for this court to grant the Commission any meaningful relief even if the Commission were to prevail on this appeal.

That argument misapprehends FECA's judicial review provision. Campaign Legal Center apparently assumes that, however we rule on its claim that dismissal was "contrary to law," the Commission has foregone any further involvement in this matter by failing to act within 30 days of the district court's remand order, as the statute requires. The Commission itself espoused a similar view in asking the district court to stay the remand order: It argued that, absent a stay, it would "face the dilemma of either taking action on the underlying administrative complaint" and risk "moot[ing] its appeal," or appealing and, due to the passage of time, "permanently losing exclusive civil enforcement jurisdiction over the case by triggering a private right of action under 52 U.S.C. § 30109(a)(8)(C)." Motion for Stay at 1-2, *Campaign Legal Center v. FEC*, No. 19-cv-2336 (D.D.C. Dec. 21, 2022), ECF No. 73. In denying the Commission's stay request, the district court, too, treated the initial 30-day remand window as the Commission's last opportunity to consider the matter. *See Campaign Legal Center*, 2023 WL 6608997, at *3.

That assumption is mistaken. It attributes to Congress the highly implausible intent to afford the Commission an opportunity to appeal a district court's adverse judgment conditioned on thereby forfeiting the opportunity to conform with the remand order in the event its appeal is unsuccessful. But the statute extends both the opportunity to appeal and to conform without casting each as a Hobson's choice. After all, 52 U.S.C. § 30109(a) not only mandates that the court allow the agency 30 days to "conform" with its declaration that the Commission's dismissal was "contrary to law." 52 U.S.C. § 30109(a)(8)(C). It also entitles the Commission to appeal "[a]ny judgment of a district court under this subsection . . . to the court of appeals." *Id.* § 30109(a)(9); *see also id.* § 30107(a)(6) (delegating to the Commission the power to "appeal any civil action in the name of the Commission").

Campaign Legal Center offers no reason to think that Congress meant to give the Commission an either/or choice: conform with the district court's remand order and give up the right to appeal, or appeal the district court's contrary-to-law ruling and give up the chance to conform if the district court's ruling is affirmed.

The only way to effectuate both FECA provisions—the 30-day remand window and the agency's appeal right—is to allow the agency to appeal and, if the district court's contrary-to-law decision is affirmed, afford the Commission on remand 30 days to "conform" with that affirmed judgment before the private right of action is triggered. In other words, FECA implicitly stays the 30-day remand window until the Commission's opportunity to appeal has expired.

Contrary to plaintiff's assertion of mootness, then, our decision carries two important legal consequences for the parties before us. Whether we affirm the district court's judgment will determine, first, whether the Commission will be subject to a remand order directing it to "conform" with the contrary-to-law declaration. *Id.* § 30109(a)(8)(C). Second, only if we affirm that the Commission's dismissal was "contrary to law," and only if the Commission fails to conform with such declaration on remand, can Campaign Legal Center maintain its private suit against Correct the Record and Hillary for America: After all, section 30109(a)(8)(C) allows a complainant to bring a civil action only after a court "declare[s] that the [Commission's] dismissal of the complaint" was "contrary to law" and after the Commission fails to "conform with such declaration within 30 days." If the dismissal was not "contrary to law," or if it was but the Commission conforms with the declaration after a renewed remand, the Commission will retain the exclusive power "to initiate civil actions" to

enforce FECA, and Campaign Legal Center's suit will be dismissed. *Id.* § 30107(e).

The Commission accordingly retains a stake in the outcome of this appeal, vitiating any claim of mootness.

**2**

Campaign Legal Center relatedly protests that the FEC's "appeal must fail" because, by declining to appear in the district court, the Commission forfeited the arguments it now advances. Pl.'s Br. 25. That forfeiture is not fatal here because, based on the remaining parties' and intervenors' submissions, the district court entered judgment on the issues the Commission raises. The "general rule" that "this court will not entertain arguments not made in the district court" does not apply where "the district court nevertheless" heard and "addressed the merits of the issue." *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 707 (D.C. Cir. 2009).

The district court allowed Correct the Record and Hillary for America to intervene to defend the Commission's dismissal and raise the arguments that the then-absent Commission did not. The district court considered (and rejected) those arguments when it held that the controlling commissioners' statement of reasons was contrary to FECA and arbitrary and capricious. *Campaign Legal Ctr.*, 646 F. Supp. 3d at 64, 67. Although Campaign Legal Center objected to Correct the Record's motion to intervene in the district court, it has not challenged that intervention decision on appeal. "[B]ecause the district court passed upon" the contrary-to-law dispute "appellants now present to this court," *Blackmon-Malloy*, 575 F.3d at 707-08 (internal quotation marks omitted), the Commission's appeal may proceed on the shoulders of Correct the Record and Hillary for America's participation in district court.

**B**

On the merits, we set aside the Commission's dismissal of a complaint if it is "contrary to law." 52 U.S.C. § 30109(a)(8)(C). A dismissal is contrary to law if it is the "result of an impermissible interpretation of the Act" or "if the [Commission's] dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion." *Orloski*, 795 F.2d at 161 (citations omitted); *see Campaign Legal Ctr. v. FEC*, 952 F.3d 352, 357 (D.C. Cir. 2020) (per curiam). Because the Commission's dismissal rested in part on an impermissible interpretation of FECA and, to the extent it did not, was arbitrary and capricious, we affirm the decision of the district court that the dismissal was contrary to law.

**1**

Campaign Legal Center does not challenge the Commission's rule that unpaid internet communications, even though of value to a campaign, are not themselves campaign contributions, and therefore are exempt from the Act's contribution limits and disclosure requirements. And it apparently agrees that at least some expenses antecedent to unpaid internet communications—including "input costs" like "video production or domain services expenses" for videos to be posted online—fall within the internet exemption. Pls.' Br. 23. The principal dispute before us is whether the Commission acted contrary to law in defining exempt "input costs" as broadly as it did. In particular, Campaign Legal Center challenges the Commission's wholesale exemption of any expenditure even a fraction of which contributed in some way to an eventual unpaid communication on the internet—an interpretation that exempts a virtually unlimited category of coordinated expenditures from regulation.

The controlling commissioners adopted what they called a "bright-line rule" that exempts from regulation under FECA all money spent "to produce an internet communication." Statement of Reasons at 13 (J.A. 279). The commissioners' approach broadly exempts "staff time, computer usage, and electricity," as well as "additional overhead and other expenses, such as for travel and the services of consultants, graphic designers, videographers, actors, and other specialists." *Id.* (J.A. 279). And the commissioners refused to require Correct the Record to separately account for and "allocate overhead expenses across internet communications" and "other activities," on the theory that doing so would "eviscerate the internet exemption" and "potentially chill political speech online." *Id.* (J.A. 279).

We hold that the Commission's approach is contrary to FECA's expansive definition of expenditures, 52 U.S.C. § 30101(9)(A)(i), and its regulation of all expenditures made "in cooperation, consultation, or concert with, or at the request or suggestion of" a candidate or party, *id.* § 30116(a)(7)(B). By reading FEC regulations to exempt any expenditure even remotely or tangentially related to an eventual posting on the internet, the controlling commissioners pave a path for the very circumvention of campaign finance laws that FECA's reporting requirement is designed to prevent. *See Buckley*, 424 U.S. at 46-47.

Take Correct the Record's poll as an illustrative example. Both the General Counsel and the controlling commissioners singled out the poll for "special attention." Statement of Reasons at 13 (J.A. 279); *see* General Counsel Report at 20 (J.A. 200). The controlling commissioners determined that paying a polling firm for the underlying poll was "necessary to make" a subsequent internet communication: the blog post publishing the poll's results online. Statement of Reasons at

13 (J.A. 279). That sufficed, in their view, to render all the payments that went into conducting the poll, analyzing the data, and writing up the results exempt from disclosure as a contribution. *Id.* (J.A. 279). Commission counsel acknowledged at oral argument that money spent in coordination with a campaign to commission a poll for the candidate's use would ordinarily be a campaign contribution. Oral Arg. Rec. 10:23-47; *see* 52 U.S.C. §§ 30101(9)(A)(i), 30116(a)(7)(B). But, under the controlling commissioners' approach, none of that spending is a contribution so long as the Committee posts the results for free on a blog and, in so doing, delivers the commissioned poll results to the candidate.

The commissioners offer no limiting principle for their expansive reading. When pressed at oral argument, Commission counsel answered only that, "in the *Buckley* speech context, we are not big on limits." Oral Arg. Rec. 15:42-49. As the district court warned, that approach essentially allows any "coordinated expenditure to escape treatment as a contribution, so long as that expenditure somehow informs a blog post or improves a tweet." *Campaign Legal Ctr.*, 646 F. Supp. 3d at 64.

The apparent implication of the blocking commissioners' refusal to "allocate overhead expenses across internet communications" and "other activities," Statement of Reasons at 13 (J.A. 279), is even broader than the district court described. On their logic, an entity that blogs or tweets in coordination with a campaign arguably exempts all of its overhead expenses from regulation under FECA—no matter that some portion of those overhead expenses is entirely unrelated to the organization's internet-related activities. Taken to its logical conclusion, that suggests a political action committee wholly devoted to coordinating its spending "for the

purpose of influencing an[] election for Federal office," 52 U.S.C. § 30101(9)(A)(i), need not disclose any portion of its rent, internet bills, or inventory costs as campaign contributions, so long as it spends a fractional portion of its time tweeting about its activities. Likewise, the implication seems to be that, if a political committee staffer spends some of her time blogging online, that committee can evade any requirement to report her salary as a campaign contribution.

That cannot square with FECA's plain text or purpose. As we explained in *Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005), "if a communication involves 'expenditure' and is made 'in cooperation, consultation, or concert with, or at the request or suggestion of' a candidate or party—the provision's two elements—then the FEC lacks discretion to exclude that communication from its coordinated communication rule." *Id.* at 99 (quoting 52 U.S.C. § 30116(a)(7)(B)). The blocking commissioners ignore that statutory limitation.

The blocking commissioners' approach is also unrecognizable in the Commission's own description of the internet exemption. The internet exception was never intended as a FECA-swallowing loophole enabling political committees to launder all their coordinated expenditures via unpaid internet postings. The commissioners who crafted it sought to "ensure that political committees properly finance and disclose their Internet communications." 71 Fed. Reg. at 18589. Indeed, the Commission explicitly noted in summarizing the exemption that "a political committee's purchase of computers for individuals to engage in Internet activities for the purpose of influencing a Federal election" remains a regulated "expenditure" by that political committee. *Id.* at 18606. By the same token, the Commission explained, an entity makes an "in-kind 'contribution'" by "providing software and Internet access for the specific purpose of enabling its employees to

influence a Federal election through political Internet activities." *Id.*

The FEC fails to explain how the construction of the internet exemption it defends here squares with the statute's regulation of coordinated expenditures. Relying on nothing but double bootstrapping, the Commission emphasizes "the agency's prerogative to interpret FECA through the promulgation of the regulation itself," FEC Br. 33, and defends its interpretation by reference to the notion that "an agency is bound by its own regulations," Reply Br. 10 (internal quotation marks omitted). But the exemption does not effect wholesale deregulation of coordinated expenditures that contribute in some part to an eventual internet posting. *See* 11 C.F.R. § 109.20(b). No legitimate agency prerogative is undermined by invalidating a legal view that conflicts with the statute and rule it purports to interpret.

We have not been asked to decide in the first instance precisely which expenses can be exempt from regulation as inputs to unpaid internet communications. As did the district court, we conclude that the expert Commission should have an opportunity in the first instance to draw that line. It suffices for present purposes to hold that the line drawn by the blocking commissioners in this case unmistakably conflicts with the statutory text and purpose.

**2**

The two naysaying commissioners also declined to investigate allegations that Correct the Record's *non*-internet-related expenditures were made in coordination with the Clinton campaign. They recognized that, even under their broad interpretation of the internet exemption, not all of Correct the Record's expenditures in the lead-up to the 2016 election were inputs to the organization's internet

communications. They acknowledged, for example, that Correct the Record's research and tracking activities, surrogacy program, and contacts with reporters did "not relate directly to [its] internet communications." Statement of Reasons at 14 (J.A. 280). So they considered whether the money was spent "in cooperation, consultation, or concert with, or at the request or suggestion of" Hillary for America, and therefore required to be reported as in-kind contributions. *See* 11 C.F.R. § 109.20.

The commissioners saw no basis to investigate those expenditures, either. In their view, "[t]he information in the record indicates that Correct the Record limited its interactions with Hillary for America to the very communications that the Commission has previously decided not to regulate"—unpaid internet communications. Statement of Reasons at 16 (J.A. 282).

That conclusion fails to meaningfully account for the complaint's allegations to the contrary—allegations citing to information that is already publicly available—which recount Correct the Record's own public statements of coordination with the Clinton campaign on all its activities, not just those the commissioners deemed related to internet postings. Take, for example, a May 2015 report in the Wall Street Journal quoting a Correct the Record spokeswoman asserting that, because her group would make no ads explicitly advocating for or against a candidate, there would be "*no* restrictions on its ability to coordinate with Mrs. Clinton's campaign." FEC Compl. ¶ 10 (J.A. 116) (emphasis added) (quoting Rebecca Ballhaus, *Pro Clinton Group Sets Novel Strategy*, Wall St. J. (May 12, 2015), https://www.wsj.com/articles/BL-WB-55199). The complaint also quotes a Time magazine article reporting that Correct the Record founder David Brock was working "on what he calls the 'coordinated' side of the Clinton campaign." *Id.* ¶ 24 (J.A. 122) (quoting Michael Scherer, *Hillary Clinton's Bulldog*

*Blazes New Campaign Finance Trials*, Time (Sept. 10, 2015), https://perma.cc/QJL3-33D8). "[S]ince [Correct the Record] does not pay for advertising advocating [Clinton's] election," Time magazine noted, "[Brock] says he can continue under current rules to talk to [Clinton] and her campaign staff about strategy, while deploying the unregulated money he raises to advocating her election online, through the press, or through other means of non-paid communications." *Id.* (J.A. 122) (quoting same). In the same vein, the Los Angeles Times reported on a Correct the Record spokeswoman's insistence that "an FEC loophole means that the coordination regulation doesn't apply to them because their work is posted only online." *Id.* ¶ 27 (J.A. 123) (quoting Joseph Tanfani & Seema Mehta, *Super PACs Stretch the Rules that Prohibit Coordination with Presidential Campaigns*, L.A. Times (Oct. 6, 2015), https://perma.cc/4N69-7BJY).

The controlling commissioners dismissed that evidence wholesale, labeling it a misguided attempt to transform "[c]oordination" into a "status," such that "coordination in one activity can be imputed to other activities" without a "transaction-by-transaction assessment to determine whether specific conduct occurred with respect to particular expenditures." Statement of Reasons at 16 (J.A. 282). To the contrary, it is Correct the Record, with its announced blanket intention to coordinate with Hillary for America on all its activities, that failed to particularize. One need not understand coordination as a "status" to take seriously allegations of Correct the Record's own categorical public assertions that "the coordination regulation doesn't apply to [it]." FEC Compl. ¶ 27 (J.A. 123) (quoting Tanfani & Mehta, *supra*). Far from suggesting that Correct the Record carefully calibrated its interaction with the Clinton campaign to respect the limits of the internet exemption, the complaint plausibly describes

Correct the Record as entirely sidestepping disclosure of expenditures it avowedly coordinated with the campaign.

The controlling commissioners' conclusion that "Correct the Record limited its interactions with Hillary for America" to unpaid internet communications runs counter to the information before the agency, and was therefore arbitrary and capricious. *See Orloski*, 795 F.2d at 161; *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And, considering Correct the Record's public admission that it planned to coordinate extensively with Hillary for America, it was unreasonable for the Commission to demand that Campaign Legal Center allege coordination as to each subcategory of activities. That is particularly true because, at this stage, the commissioners need identify only "reason to believe that [Correct the Record] has committed" a FECA violation in order to trigger its obligation to "make an investigation of such alleged violation," 52 U.S.C. § 30109(a)(2), that would allow the Commission to determine whether the alleged violation has evidentiary support.

The Commission failed to explain how it concluded, in the face of the complaint and the publicly available sources it quotes, that it had no grounds for investigation. We accordingly hold that the blocking commissioners' analysis of non-internet-related expenditures was arbitrary and capricious and thus contrary to law. *Orloski*, 795 F.2d at 161. For the reasons explained above, *see supra* at 22-24, our affirmance of the district court's contrary-to-law holding means the FEC will have an opportunity on remand to conform with our ruling. *See* 52 U.S.C. § 30109(a)(8)(C).

## C

That leaves only the FEC's argument that Campaign Legal Center "lack[s] standing" as to four counts of the administrative complaint that allege violations of FECA's source restrictions and contribution limits. FEC Br. 26. Citing *CLC I*, the Commission reasons that Campaign Legal Center has standing to challenge only the alleged disclosure violations, and accordingly urges us to "direct the district court to dismiss the complaint to the extent it seeks an order regarding" the source restrictions or contribution limits. *Id*. But the district court has not ordered the Commission to take any action specific to those counts, so this appeal need not address them. Plaintiff's appeal of the legal sufficiency of the internet-exemption and coordination allegations is supported by their standing to seek relief for informational injuries, which this court has already sustained. *See CLC I*, 31 F.4th at 783. We decline the Commission's invitation to make an anticipatory ruling on a standing question, keyed to a specific form of relief, that may never arise.

The FEC's argument rests on the misapprehension that, without a further caveat as to plaintiff's standing, the district court's remand order would require the FEC to take enforcement action on the source- and contribution-limit allegations whose dismissals the Commission believes plaintiff lacks standing to challenge in federal court. But the district court's remand order did no such thing. It provided that:

> Because the Commission's decision was based on an impermissible interpretation of the Act and was otherwise arbitrary and capricious, its dismissal of Plaintiffs' complaint was contrary to law. The Court leaves it to the expert Commission on remand to sketch the bounds of the internet exemption and to

> more fully analyze the facts before it. That exception must have real bounds, however, and the clear evidence of coordination discussed above shall inform the Commission's analysis. . . .
>
> For the foregoing reasons, the Court will grant CLC's Motion for Summary Judgment, deny [Correct the Record's], and direct the Commission to conform with this decision within 30 days. *See* 52 U.S.C. § 30109(a)(8)(C).

*Campaign Legal Ctr.*, 646 F. Supp. 3d at 69. The order requires the Commission to "sketch the bounds of the internet exemption and . . . more fully analyze the facts before it." *Id.* Whether doing so will lead the Commission to take enforcement action with respect to the source restrictions and contribution-limits claims is a question the district court did not address.

That is for good reason. Plaintiff's suit challenges only one FEC action: dismissal of the administrative complaint following the blocking commissioners' conclusion that Correct the Record's expenditures were not campaign contributions. As we explained in *CLC I*, the informational injury—as to which plaintiff's standing is settled—traces to that dismissal. A Commission determination that there was reason to believe Correct the Record made contributions to Hillary for America could result in additional disclosures of the amount of such contributions. *CLC I*, 31 F.4th at 783. Whether a future determination by the Commission that Correct the Record contributed to Hillary Clinton's campaign may have other implications for the FEC's treatment of Correct the Record's expenditures is not at issue here. In any event, the Commission may choose, under a correct reading of the law, to enforce FECA's contribution limits against Correct the Record and

Hillary for America, regardless of whether Campaign Legal Center would have Article III standing to challenge the Commission's failure to do so. We need go no further than directing remand to the expert Commission to "sketch the bounds of the internet exemption and . . . more fully analyze the facts before it." *Campaign Legal Ctr.*, 646 F. Supp. 3d at 69.

* * *

For the foregoing reasons, the judgment of the district court is affirmed. The matter is remanded to the district court with instructions to remand to the FEC consistent with 52 U.S.C. § 30109(a)(8)(C) and the discussion herein.

*So ordered.*